**CRUX COMPUTER CORPORATION,**
**Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 90–180C.**

United States Claims Court.

July 29, 1991.

Richard Earl Clark, Los Angeles, Cal., for plaintiff.

John S. Groat, with whom were David M. Cohen, Director, Commercial Litigation Branch, and Stuart M. Gerson, Asst. Atty. Gen., Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## OPINION

SMITH, Chief Judge.

This claim for bid protest costs comes from the contracting officer's denial of Crux Computer Corporation's (Crux) claim for the costs of protesting a procurement of a Shuttle Modal Inspection System. These costs were incurred when Crux protested the initial award of a contract to Zonic Corporation (Zonic). Subsequent reevaluation by NASA corrected some of the alleged errors complained of by Crux. Other allegations of error were rejected. However, based upon the reevaluation evidence the contract was still awarded to Zonic. The court finds that NASA's initial decision was not arbitrary and capricious, even though NASA later corrected some elements of it. The court must therefore dismiss plaintiff's complaint.

## FACTS

On June 10, 1988, the National Aeronautics and Space Administration (NASA) issued Request for Proposal (RFP) No. 9–BG41–28–8–8P relating to a Shuttle Modal Inspection System (SMIS)[1] for the John F. Kennedy Space Center, Cape Canaveral, Florida. The SMIS would check the physical integrity of shuttles before flight. Specifically, technicians would attach the SMIS to over 200 places on the heat-resistant tiles of the Shuttle. The SMIS would then vibrate the Shuttle in several ways. The results would be digitalized and analyzed by computer. The proposed contract was a small business set-aside; notice was sent to 56 small businesses. Nine of those companies participated in a walk-through of the Space Center. In response to the RFP, Crux and two other companies submitted proposals to NASA on August 31, 1988.

On October 3, 1988, NASA determined that only Crux and Zonic Corporation were in the competitive range. NASA conducted oral and written discussions with both parties.[2]

On November 14, 1988, NASA selected Zonic Corporation as the proposed awardee.[3] On November 30, 1988, NASA debriefed Crux by telephone on the basis for NASA's selection of Zonic. On December 14, 1988, Crux protested to NASA the proposed award to Zonic Corporation. After receipt of NASA's written "Debriefing Notes", Crux supplemented its protest on December 29, 1988. As amended, the protest was based on seven grounds:

I. NASA's evaluation of the data acquisition and data analysis subsystems proposed by Crux was arbitrary and in violation of federal procurement laws because it did not adhere to the evaluation criteria set forth in the RFP and because it was not preceded by meaningful discussions of Crux's original technical proposal.

II. NASA's evaluation of the trailer proposed by Crux was arbitrary and in violation of federal procurement laws because it was not preceded by meaningful discussions of Crux's original technical proposal.

III. NASA's evaluation of Crux's systems integration capability was arbitrary and in violation of federal procurement laws because it does not adhere to the evaluation criteria set forth in the RFP.

IV. NASA's evaluation of the training proposed by Crux was arbitrary.

V. NASA's evaluation of Crux's proposal was arbitrary and in violation of federal procurement laws because it assigned

---

1. The total SMIS procurement package consisted of the following:
 1. Shuttle Modal Inspection System
 a. Excitation Subsystems
 b. Instrumentation Subsystems
 c. Data Acquisition Subsystem
 d. Data Analysis Subsystem
 2. Analysis Software Package
 3. Mobile Trailer
 4. Equipment Documentation (e.g., manuals, schematics, etc.)
 5. Checkout Test Plan

6. Acceptance Test Plan
7. System Integration/Installation

2. On October 19, 1988, Crux submitted its proposal verification and support in response to NASA's written questions to Crux of October 11, 1988. Oral discussions between Crux and NASA actually took place on October 21, 1988.

3. Crux's protest delayed the awarding of the contract to Zonic Corporation until April 20, 1989.

more importance to technical factors than to price and therefore did not adhere to the criteria set forth in the RFP.

VI. The data acquisition subsystem proposed by Zonic may be either a prototype or not sufficiently tested in which case Zonic's proposal should have been ruled unresponsive.

VII. NASA's evaluation of Crux's proposal was arbitrary and in violation of federal procurement laws because the scores assigned to evaluation factors in the mission suitability area are inconsistent.

The protest requested that NASA award the contract to Crux, or in the alternative that it provide the opportunity for the submission of new or amended proposals. Crux also requested the award of protest costs, including reasonable attorney's fees.

Upon examination of the report of the Source Evaluation Committee (SEC) in light of the protest, the contracting officer, Rae C. Martel, concluded that the evaluation had not been proper in some respects. Specifically, the SEC's findings might not have been in strict accordance with the evaluation criteria established in the RFP. Accordingly, the SEC subsequently reevaluated both proposals in strict accordance with the RFP. The SEC presented its findings to the Source Selection Official, who affirmed his selection of Zonic Corporation.

The contracting officer subsequently denied Crux's "request that award of the contract be made to Crux and that Crux be paid proposal preparation costs, protest costs, and reasonable attorney's fees." NASA's response to the protest is dated February 27, 1989. The response conceded the validity of most of protest grounds I, II, III and IV. It totally rejected protest grounds V, VI and VII. Among other things, NASA conceded that it had "considered subject matter under some criteria [for evaluation] which could not be reasonably subsumed" under them. NASA denied Crux's request for proposal and protest costs, including attorney's fees.

Crux alleges that had NASA's initial evaluation been fair and in compliance with the applicable laws, Crux would not have protested NASA's first proposed award to Zonic Corporation. Crux claims that it was forced to incur costs and expenses, and was thereby damaged. Crux asks for $13,-063.13, of which $3,684.29 is for "in-company costs", $6,766.21 is for legal costs, and $2,612.63 is for "general and administrative expenses."

## DISCUSSION

 Whenever the government solicits proposals or invites bids, it enters into an implied-in-fact contract with the various offerors to treat those offerors fairly. *Keco Industries, Inc. v. United States*, 428 F.2d 1233, 192 Ct.Cl. 773, 780 (1970) (*Keco I*). A breach of the contract will generally entail return of bid preparation or proposal costs. *Id.* 428 F.2d at 1240, 192 Ct.Cl. at 785. To establish that the government breached its implied-in-fact contract, the plaintiff must show that the government's behavior was arbitrary and capricious. *Keco Industries, Inc. v. United States*, 203 Ct.Cl. 566, 574 (1974) (*Keco II*).

However, Crux is not asking for bid preparation costs here. It is seeking the costs of its bid protest to the contracting officer and the Comptroller General. Crux is aware that it cannot sue for lost profits; under *Heyer Prod. Co. v. United States*, 135 Ct.Cl. 63, 69 (1956). A discussion on whether precedent exists for denying bid protest costs is in order.

### Damage Jurisdiction

 The government claims that under *AT & T Technologies, Inc. v. United States*, 18 Cl.Ct. 315 (1989), and associated case law, only bid preparation costs are recoverable; bid protest costs are not. However, the court does not read *AT & T, Keco I & II*, and the other Court of Claims cases so expansively. Indeed, most of those cases addressed the issue of whether the implied-in-fact contract to fairly consider bids included *profits* as well as bid preparation costs, not protest costs. *See e.g., Excavation Constr., Inc. v. United States*, 494 F.2d 1289, 204 Ct.Cl. 299, 301 (1974); *Keco Industr., Inc. v. United States*, 428 F.2d 1233, 192 Ct.Cl. 773, 784–85 (1970)

(*Keco I*); *Heyer Prod. Co. v. United States*, 135 Ct.Cl. 63, 69 (1956). The reason for denying profits is simple; they are too speculative and cannot be determined with any certainty.

In *AT & T*, the court seems to suggest that protest costs are not allowable. *AT & T*, at 322. This court declines to follow that suggestion. Unlike profits, protest costs can be ascertained quite readily. Therefore, the court holds that it does have jurisdiction to grant bid protest costs as well as bid preparation costs. The court must thus look to *Keco II* for guidance in ascertaining the standards to apply for a determination of whether the government has breached the implied-in-fact contract.

### *Keco II Standards*

*Keco II* lists four factors to consider in determining whether a disappointed bidder should receive bid preparation costs: 1) the presence or absence of bad-faith by the government; 2) whether a reasonable basis exists for the government's decision; 3) the amount of discretion afforded the government official; and 4) the violation of a statute or regulation. *Keco II*, at 574. A discussion of the relevant factors as they are applicable to the instant dispute follows.[4]

### *Reasonable Basis*

■ Crux has alleged that there was no reasonable basis for the government's actions. A reasonable basis requires a rational connection between the facts of the situation and the decision made. *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 *reh. den.*, 420 U.S. 956, 95 S.Ct. 1340, 43 L.Ed.2d 433 (1974). The majority of Crux's claims al-

lege the lack of a rational connection between the facts and the selection of Zonic. Specifically, the first four of Crux's seven grounds seem to raise a question of whether the decision had a reasonable basis, since NASA modified the evaluations after the protests.

### Ground I

Data analysis subsystems—NASA had five concerns with Crux's proposal involving the data analysis subsystems. Those concerns can be summarized as follows: the development of reformatting problems; the compatibility of Crux's software with MPLUS (which NASA uses); data handling efficiency; the level of discussion between NASA and Crux; and the efficiency and compatibility of data reformatting.[5]

The evaluating committee determined that since Crux did not have an existing developed software reformatting program this aspect of its proposal was very weak— even more so since the proposed software would not provide a more direct interchange. The reevaluation of the proposal did not change the committee's original views.[6] Crux disputed the MPLUS compatibility requirement in its protest letter. However, Section L, 2.1.3, requires the proposed software to be "completely compatible" with JSC's current software (NASTRAN, IDEAS, MPLUS). The requirement was unambiguous. Crux did not follow it. Under data handling efficiency, the evaluating committee found Crux's proposal to have a major weakness. Crux, in its protest, spent some time discussing its "conservative" figures for data conversion. It addressed the issue of substantiation only briefly. Substantiation was the committee's concern. It had been so during the period prior to submission of Best and Final Offers (BAFO) and the committee

---

4. Crux does not allege either bad faith or any statutory or regulatory violations. However, Crux alleges that the CO did not engage in a sufficient amount of discussions concerning Data Handling Efficiency, which is covered under FAR § 15.610(b)–(c). The court holds this decision, on the level of discussion, was clearly within the CO's discretion and hence did not violate the *Keco II* standards. This matter is effectively dealt with in the CO's decision.

5. The efficiency and compatibility of data formatting were only minor weaknesses of Crux's proposal and were discussed more fully in the contracting officer's response to Crux's protest.

6. Crux has alleged that since it submitted its BAFO, it has obtained new data which would permit a more direct interchange without proprietary data. Neither the committee nor the court can consider information obtained after the BAFO.

had asked specifically during that period for substantiation of the figures. Since Crux failed to follow instructions, there was a reasonable basis for NASA's actions.

Ground II

SMIS Trailer—NASA had originally downgraded this portion of Crux's proposal because Crux had neglected to include a staircase or ladder in its proposal, and had included a commercial trailer, which apparently would have provided a harsher ride. Upon reviewing Crux's proposal, NASA eliminated the staircase from its evaluation. It also took note of the air ride which Crux had proposed in its BAFO, increasing the score under the criterion. NASA's corrections on these features do not command reimbursement of bid preparation costs by themselves. The items were minor concerns to NASA's evaluation committee and did not affect greatly the outcome of the award. There was a rational basis for NASA's first evaluation here.

Ground III

Systems integration capability—Crux strenuously objected to the apparent requirement of an end-to-end checkout of the system at Crux's facility. NASA reevaluated this aspect of Crux's proposal, finding that while it had found improperly a weakness regarding Crux's approach, it also found the proposal lacked any indication of experience or expertise in assembling or operating processors used in modal analysis. Expertise and experience were crucial to winning the contract. There was thus a reasonable basis for NASA's first evaluation also.

Ground IV

Training—NASA originally calculated the five day training period allotted in Crux's proposal to be a weakness. NASA had specified that training be at least nine days. In addition to the low ranking, NASA increased Crux's price to take into account the four days' additional training. The court finds that while NASA may have ranked improperly this aspect of Crux's proposal, there does not exist the unreasonableness that would mandate recovery of costs. The increased costs were necessary.

Most importantly, the training was not one of the prime components of the system.

### Degree of Discretion

Discretion is the third criterion under the *Keco II* test. Essentially, the government's actions are judged on a sliding scale, the more discretion afforded to the contracting officer under the RFP, the less likely the court will interfere with the contracting officer's decision. *Aviation Enters., Inc. v. United States*, 8 Cl.Ct. 1, 19 (1985).

Plaintiff's fifth argument alleges that NASA violated Article M–8 of the solicitation which states that technical and cost factors are of "approximately equal importance." Crux contends that since its proposal was adequate and its price was lower, it should have been given the contract. However, Crux neglects the CO's discretion on this matter, and the qualitative and quantitative differences between Crux's and Zonic's proposals. The government correctly cites *Prison Health Services, Inc.*, B–215613.2, 84–2 CPD ¶ 643 (Comp. Gen., Dec. 10, 1984), for the proposition that it is the CO's discretion to determine the application of the technical and cost evaluation results. Crux argues that "an acceptable technical proposal coupled with a low price should prevail." The court agrees that in such a situation, an acceptable technical proposal at a low price could succeed. However, the court does not agree that such a proposal *must* succeed. It was within the CO's discretion to determine the relative merits of the stated factors he would use in determining which bid to accept. The content and extent of discussions is not generally subject to review absent a showing of an arbitrary or unreasonable basis. *Id.* There has been no such showing in this case.

Crux also has alleged that NASA acted arbitrarily and capriciously in not rejecting Zonic's data acquisition subsystem. Crux's reason for the claimed need to reject is that Zonic's proposed subsystem had not been in operation for a minimum of 30 days. However, Crux has again misread the RFP. NASA only required that the subsystem

"be available." Zonic's system was available, though it did not have 30 days of field usage. This weakness was reflected in Zonic's score. This decision was within NASA's discretion.

On December 29, 1988, Crux sent NASA a supplement to its protest. Crux felt that NASA's evaluation of weaknesses (major or minor) was arbitrary and capricious. Crux's position was that two minor weaknesses equaled one major weakness. However, again Crux came to a conclusion without looking at all the facts. NASA's decision was based not only on weaknesses but on strengths. Zonic's strengths were superior to those of Crux. This clearly was within the discretion of the CO.

## CONCLUSION

Based on the above discussion, the court holds that the plaintiff is not entitled to legal relief as it has not met its burdens under *Keco II* to demonstrate arbitrary or capricious behavior. Therefore, the plaintiff's motion for summary judgment is denied, the government's motion to dismiss is denied, its crossmotion for summary judgment is granted. Each party is to bear its own costs.