**R.R. DONNELLEY & SONS,
CO., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 96–784C.

United States Court of Federal Claims.

Jan. 30, 1998.

Fredric G. Antoun, Jr., Chambersburg, PA, for plaintiff.

Steven E. Gordon, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Kerry L. Miller, U.S. Government Printing Office, of counsel.

## OPINION

MILLER, Judge.

In this case before the court after trial, the issues to be decided are 1) whether the contracting officer was arbitrary and capricious in canceling an invitation for bids, thereby entitling plaintiff to bid preparation and related costs; and 2) whether, under an implied-in-fact contract theory, plaintiff may recover its pre-award survey and start-up costs incurred during what plaintiff characterizes as the post-bid proposal negotiation phase.

## FACTS

R.R. Donnelley & Sons, Company ("plaintiff"), challenges the United States Government Printing Office (the "GPO") for canceling an invitation for bids related to the printing of patents, thus entitling it to bid preparation and related costs. Plaintiff charges that the contracting officer lacked a reasonable basis for concluding that the printing requirements of the U.S. Patent and Trademark Office (the "PTO") would drop by 20%. Instead, plaintiff insists that the requirements would drop by only 7.6%, an insufficient reduction to warrant the cancellation of the solicitation.

1. *Summary of litigation before the Court of Federal Claims*

Plaintiff filed suit in the Court of Federal Claims on December 16, 1996. Its complaint contained two counts, breach of implied contract (Count I) and equitable estoppel (Count II). Plaintiff sought $336,673.37 in monetary

damages for costs incurred in "bid preparation; formulation and implementation of quality, security and production plans; pre-award survey and provision of necessary information to GPO to respond to various protests and preparation to perform the contract; facilities acquisition cost and expenses; [and] legal expenses." Defendant moved to dismiss Count II for lack of subject matter jurisdiction and for summary judgment on Count I. Following argument on defendant's motion, the court entered an order on July 28, 1997, denying summary judgment on Count I and dismissing Count II for lack of subject matter jurisdiction. *See R.R. Donnelley & Sons, Co. v. United States*, 38 Fed. Cl. 518 (1997).

2. *The solicitation*

On November 15, 1993, the GPO issued a solicitation for the printing of patents and related documents for the PTO, a program known as D306-S.[1] The solicitation, issued in the form of Invitation for Bids for Program D306-S (the "IFB"), called for a one-year requirements contract to begin on February 1, 1994, and to end on January 31, 1995. The specifications of the IFB called for 45 soft copy[2] patent sets—40 for distribution to foreign patent offices and five for internal PTO use. The IFB anticipated that print orders would be placed on a weekly basis, as patents are issued[3] on a weekly basis. For each issue the PTO expected an average of 52 copies of each patent to be ordered, of which 45 copies of each patent would form the 45 sets required for foreign and PTO distribution. Beyond the 45 copies, the number of copies ordered of each patent would vary, as some patents would be more popular than others. Because the PTO knew that it would always require at least 45 patent sets, the solicitation also called for a line-

---

1.  Specifically, the program buys hard copy patents, printed on ledger stock, and soft copy patents, printed on offset stock.

2.  The IFB defines a "soft copy set" as "[o]ne copy of each utilities, plants, reissues, reexam[ination]s, Certificate of Correction and SIRs patent for a given issue, printing on White offset Book (or as specified under STOCK/PAPER)." The patent sets transmitted to foreign countries'

patent offices are soft copies. Patent sets consist of all patents issued each week, whereas patent copies refer to duplicates of a single patent.

3.  "Issue" is defined by the IFB as "[t]hose allowed patents, related indices, and other printed matter which constitute an *Official Gazette* for a given week."

item price for the first 45 copies (which form the 45 sets) and a price for each additional five copies or fraction thereof. In other words, the pricing schedule required the GPO to pay for at least 45 copies of each patent, regardless of whether fewer actually were ordered, or needed.

On December 13, 1993, the GPO informed plaintiff that it was the apparent low bidder.[4] Soon thereafter, the contracting officer ordered a full pre-award survey[5] and began evaluating whether plaintiff possessed the technical, financial, and production resources necessary to perform the contract.

On January 11–12, 1994, a government pre-award survey team—consisting of three GPO employees and three PTO employees—conducted an on-site survey of plaintiffs facility. Llewellyn W. Dortch, a Donnelley employee in the Federal Government Group who was involved in preparing plaintiffs bid for the Program D306–S contract, testified that plaintiff's preparedness to perform the contract within 30 days of award was of some concern to the GPO. Mr. Dortch understood that a line item of the specification required preparedness within a month of contract award. At the end of the pre-award survey, Mr. Dortch testified, GPO representatives indicated that plaintiff had done a good job and that there was a high likelihood that it would receive the contract "shortly."

Similarly, David E. Davis, President, Donnelley Com–Com Division, who also was involved in preparing the bid, testified that at the end of the pre-award survey, a GPO representative, Larry McHugh, told him that the plans looked fine, although Mr. McHugh questioned the adequacy of the floor plan and equipment configuration of the building plaintiff planned to use, and whether plaintiff could make the necessary renovations within 30 days of award. Consequently, plaintiff investigated the possibility of leasing another building. The day after the pre-award survey, Mr. Davis and two or three GPO representatives inspected this facility, which the GPO deemed adequate and approved. Pursuant to the GPO's approval, plaintiff obtained an option to lease the building. After the final extension of the option, on March 6, 1994—well after the responsibility determination—plaintiff signed a lease on the building.

Gayle E. Diehl, former manager of the Demand Print Center, Donnelley Com–Com Division, was responsible for drafting and revising the production plans. She testified that the plans were repeatedly sent to the GPO for approval and that "[w]e had to prove to the GPO that we were fully capable of fulfill[ing] the contract." Ms. Diehl explained that this required the installation of equipment, training of staff, and the ability to be "up and running in 30 days," as per the contract specifications.

On January 28, 1994, the GPO's pre-award survey team recommended to the contracting officer that the GPO award the Program D306–S contract to plaintiff. On or about this date, plaintiff was determined to be a responsible bidder.

On March 22, 1994, however, the contracting officer, through the Contract Review Board, canceled the Program D306–S solicitation "due to extensive changes in the estimated requirements." The major impetus for the cancellation was the revelation that the PTO would not require 40 utility[6] patent sets for foreign distribution, but would only require 28 sets. This expected reduction of 12 patent sets altered the economic feasibility of the IFB, especially given that the solicitation's pricing structure was based on 45 patent sets.

---

4. The GPO had received two bids, one from plaintiff in the amount of $2,887,812.39 and one from GraphicData, Inc., the incumbent Program D306–S contractor, in the amount of $2,933,-925.23.

5. The IFB stated that a pre-award survey was necessary to make a responsibility determination. If deemed necessary by the contracting officer, the contractor would also be required to perform a pre-award test involving the production of copies in accordance with the specifications.

6. Utility patents, for inventions, comprise the vast majority (approximately 95%) of all issued patents. Other types of patents include design patents, for nonfunctional features of an item, *e.g.*, its look or shape, and plant patents, *e.g.*, a sexually reproduced plants or grafted plants.

### 3. *The 12–patent set reduction*

Contrary to the court's findings following the summary judgment proceedings, trial revealed that the 12–patent set reduction was not a direct result of a conversion to CD–ROM storage of patents. *See Donnelley,* 38 Fed.Cl. at 524. At the time, in early March 1994, some confusion was present among PTO and GPO employees involved in Program D306–S regarding the effect of foreign countries' CD–ROM capability on the need for fewer paper patent sets for foreign distribution. Robert W. Saifer, the PTO's Director for the Office of International Liaison, testified as to the policy statement issued by the PTO regarding the exchange of CD–ROM patent sets with other countries. Although discussions regarding the Japanese CD–ROM exchange occurred among the PTO, the European Patent Officer ("EPO"), and the Japanese Patent Officer ("JPO"), the policy was never implemented.

What was implemented, however, was the Patent Document Exchange Policy through which, along with a March 16, 1994 Notice from PTO Commissioner Bruce A. Lehman, the PTO established a policy whereby, upon request, all foreign patent offices that 1) maintained a classified search file [7] and 2) offered at least one paper set of their patent documents to the PTO would continue to receive one paper set of U.S. patents from the PTO. This policy was to take effect on October 1, 1994. The EPO and JPO would be excluded from this policy and would continue to receive multiple sets of paper patent sets. Other countries that had received multiple paper patent sets would receive, under the policy, only one set; Mr. Saifer testified that this approach "would save at a minimum, 12 sets. It could be more than that, because there might be countries that don't need to get any paper from us, now that we are offering CD–ROM." [8] Whether particular countries had CD–ROM capability was of no consequence in that each country would still receive one paper set, unless a country wanted the patent set on CD–ROM in lieu of paper. In a March 22, 1994 letter, Richard A. Bawcombe, Director, PTO Office of Publication and Dissemination, informed the contracting officer that the 12–patent set reduction would occur because 12 countries had CD–ROM capability. However, Mr. Saifer testified that, although a 12–set reduction would take place, Mr. Bawcombe's "reasoning behind how we got that number 12 is incorrect." Mr. Bawcombe himself admitted that the explanation for the reduction "was in error." [9] At no point, however, did either Mr. Saifer or Mr. Bawcombe indicate that the 12–set reduction itself was ever in doubt.

Of central importance in this case is the March 15, 1994 memorandum from the GPO Contracting Officer Richard Weiss to the GPO Contract Review Board, which stated

---

**7.** A classified search file is a set of patents that is divided into numerous categories based on different technologies. It is relied upon by a given patent office's examining corps and independent patent searchers to search for relevant patents. While CD–ROM storage of patents is compatible with numerical patent sets, used for retrieval purposes, it is incompatible with a classified patent set because searching necessitates categories that contain all issued patents. A single CD–ROM, *e.g.,* for all patents issued each year, would not allow a searcher to search all issued patents within a single category.

**8.** According to Mr. Saifer's memorandum of May 31, 1994, the 12–set reduction—a result of sending each country only one paper set—would be accomplished by savings from the following countries (paper set savings in parentheses): Austria (1); China (1); Germany (4); Denmark (1); Great Britain (2); Sweden (2); and the Russian Federation (1). Testimony of the contracting officer, Richard Weiss, confirmed these countries and numbers by examining the specifications' delivery requirements and subtracting all but one set.

**9.** It is easy to understand the confusion surrounding the CD–ROM capability issue. Commissioner Lehman's Notice explains that in order to save money, the PTO "would like to substitute CD–ROM U.S. patent documents for those currently provided in paper or microfilm under our exchange agreements." The PTO offered to provide two CD–ROM subscriptions for each paper patent set replaced. However, given that not all countries may have CD–ROM reading capability, the PTO would continue to send a single paper patent set, assuming the country maintained a classified search file and offered one of their paper patent sets to the PTO. Therefore, although this new policy was not a direct result of countries' capability to read or use CD–ROM patents, or a conversion to CD–ROM patent storage per se, it was certainly related to encouraging the use of CD–ROM.

that the conversion to CD–ROM would result in the reduction of 12 paper patent sets. In the memorandum Mr. Weiss opined that

> [t]he initial reduction of the 12 sets would result in an immediate reduction of approximately 20% in the soft copy work load. This reduction would directly [a]ffect the printing line items, the collating line items (if a charge were entered), and result in a significant drop in the paper to be used. Further reductions would result in a workload drop in excess of 50% over what was originally estimated.

Mr. Weiss admitted that in writing this memorandum he was under a "misimpression" that the 12-set reduction was related to the number of countries that have CD–ROM capability. Mr. Weiss nonetheless testified that only the 12-set reduction mattered; the source of the reduction was immaterial. When asked what he meant by the word "immediate," in the passage quoted above, Mr. Weiss explained that "[t]he reduction in quantity would start with the October 1 issue [of patents] and would hit the contractor about the middle of August, about five months into the contract." He further explained that the reference to a 50% reduction did not relate to the 20% reduction in soft-copy workload, which was based on the 12-patent set reduction. Rather, the 50% referred to the possibility of an additional reduction of eight patent sets by countries opting for CD–ROM patent sets, although this called for a degree of speculation.

Mr. Weiss was adamant that he based his calculations and his memorandum on a reduction of 12 patent sets, a number which came from both a high-ranking official in the PTO Commissioner's office and GPO representatives. Mr. Weiss explained at length the calculations he used to arrive at an overall 25% reduction in the total impressions (single sides of a page) required by the contract. Thus, after a page of calculations, the 12-patent set reduction translated into a reduction from approximately 81 million impressions (the basis of award and the same figure used by plaintiff) to 60 million impressions, a 25% reduction of impressions. Mr. Weiss testified that he then lowered the figure to 20% by "tak[ing] five percent off as

a[n] error factor." He used the 20% figure in his March 15, 1994 memorandum to the Contract Review Board. This figure is hotly disputed by plaintiff.

On March 15, 1994, Kerry Miller, counsel for the GPO, informed plaintiff that the GPO planned to cancel the IFB because the conversion to CD–ROM would cause a 25% reduction in the PTO's paper requirements. The GPO formally canceled the Program D306–S solicitation on March 22, 1994, citing "extensive changes in the estimated requirements" as the reason for cancellation.

## DISCUSSION

### 1. *Standard of review*

When an unsuccessful bidder incurs expenses in preparing a bid for a government contract, these expenses normally are "lost," as a cost of doing business. *Lincoln Servs., Ltd. v. United States,* 678 F.2d 157, 158, 230 Ct.Cl. 416 (1982). In soliciting proposals or inviting bids, the Government enters into an implied-in-fact contract with offerors to consider their bids "fairly and honestly.'" *CACI, Inc.–Fed. v. United States,* 719 F.2d 1567, 1573 (Fed.Cir.1983) (quoting *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1367 (Fed.Cir.1983) (*en banc*)); *see also Heyer Prods. Co. v. United States,* 135 Ct.Cl. 63, 69, 140 F.Supp. 409 (1956) (dealing with bad faith-inducement of bids). "'The standards that permit a disappointed competitor to recover proposal preparation expenses are high and the burden of proof is heavy.'" *E.W. Bliss Co. v. United States,* 77 F.3d 445, 447 (Fed.Cir.1996) (quoting *Lincoln Servs.,* 678 F.2d at 158, 230 Ct.Cl. at 416; and citing, *inter alia, CACI, Inc.–Fed.,* 719 F.2d at 1573; *Coastal Corp. v. United States,* 713 F.2d 728, 730 (Fed.Cir.1983)). If the Government's consideration of the unsuccessful bidder's proposal was arbitrary or capricious, the Government thereby breaches its implied contract and the bidder may recoup the costs of preparing the bid or proposal. *Keco Indus., Inc. v. United States,* 192 Ct.Cl. 773, 785, 428 F.2d 1233, 1240 (1970) (*Keco I* ) (noting that "plaintiff should be allowed to recover only those costs incurred in preparing its technical proposals and bids"); *see*

also *AT & T Technologies, Inc., v. United States,* 18 Cl.Ct. 315, 321 (1989) (finding that damages for breach of implied contract "are limited exclusively to bid and proposal preparation costs").

■ In *Keco Indus., Inc. v. United States,* 203 Ct.Cl. 566, 492 F.2d 1200 (1974) (*Keco II* ), the United States Court of Claims, predecessor to the Federal Circuit, articulated four "criteria" to determine whether an agency's action is arbitrary and capricious:

> One is that subjective bad faith on the part of the procuring officials, depriving a bidder of the fair and honest consideration of his proposal, normally warrants recovery of bid preparation costs. A second is that proof that there was "no reasonable basis" for the administrative decision will also suffice, at least in many situations. The third is that the degree of proof of error necessary for recovery is ordinarily related to the amount of discretion entrusted to the procurement officials by applicable statutes and regulations. The fourth is that proven violation of pertinent statutes or regulations can, but need not necessarily, be a ground for recovery. The application of these four general principles may well depend on (1) the type of error or dereliction committed by the Government, and (2) whether the error or dereliction occurred with respect to the claimant's own bid or that of a competitor.

*Id.* at 574, 492 F.2d at 1204 (citations omitted); *see also Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 65, 617 F.2d 590, 597–98 (1980) (applying *Keco II* criteria).

2. *Application of Keco II criteria*

A bidder need not show that all four *Keco II* factors are present in order to establish that Government action is arbitrary and capricious. *See Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 n. 5 (Fed. Cir.1988) ("[T]he absence of any allegation or evidence of bad faith ... is not determinative.").

With respect to the first *Keco II* factor, plaintiff does not suggest bad faith on the part of either the contracting officer or the Contract Review Board. Rather, plaintiff questions the reasonableness of the decision to cancel the IFB and argues vehemently that Mr. Weiss's calculations were, as plaintiff's counsel put it, "dead wrong" and that the "GPO was shooting in the dark."

The gravamen of plaintiff's case is the contention that Mr. Weiss lacked a reasonable basis for predicting a 20% reduction in the PTO's need for paper patent documents and that his decision to recommend the cancellation of the IFB therefore was arbitrary and capricious. A reasonable basis requires a " 'rational connection' " between the facts of the situation and the decision made. *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447, (1974) (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962)). To assess the existence of a rational connection, the court must first examine whether a 12–patent set reduction would occur and the effect of this reduction on the total number of impressions required by the solicitation over the appropriate period of the contract award. The court then must determine whether, given this reduction, the cancellation of the IFB was reasonable. Plaintiff does concede that if the reduction, in fact, was 20%, then the cancellation would have been reasonable. The lynchpin is the 20% figure, which plaintiff maintains was actually 7.6%—not enough reasonably to warrant canceling the solicitation.

Despite the confusion at the time as to the precise reason for the PTO's reduction in printing needs, Mr. Weiss nevertheless relied upon correct information—that a 12–patent set reduction would occur as of the October 1 issuance and would affect the contractor's printing requirements as of August. Mr. Weiss assumed that the earliest the contract could be awarded plaintiff would be April 1, given the pending bid protests. Because the termination date of the contract was January 31, 1995, 10 months would remain on the contract. Mr. Weiss calculated that, over the remaining 10 months of the contract, the reduction of 12 utility patent sets (of 40 sets for foreign distribution) would result in a 20–25% reduction in the total impressions that

the PTO would require. Plaintiff disputes this calculation on several grounds.

First, plaintiff argues that reduction is not 12 patent sets, but eleven, because one set was double-counted. However, both Messrs. Saifer and Weiss testified that the new Patent Document Exchange Policy would result in a 12–set reduction, and plaintiff was unable to dislodge this established figure.

Second, plaintiff contends that the basis of award should be the full 12 months of the contract, not the remaining ten months predicated on a contract award date of April 1. The solicitation anticipated that the PTO would place print orders for patent documents on a weekly basis, corresponding with the PTO's weekly issuance (or granting) of patents. Although the IFB was a requirements contract, the incumbent contractor would continue to print patent documents until plaintiff was awarded the contract (likely not until April 1). Only if the PTO ceased asking the incumbent to print patents—creating a two-month backlog for plaintiff to fill once awarded the contract—would it make sense to base the award on 12 months. The court must focus on the beginning of the contract award rather than the end, because it is sheer speculation whether the contracting officer would have extended the contract an additional two months.

Third, plaintiff asserts that Mr. Weiss selectively applied the 12–patent set reduction to "different aspects of the contract." Although true, this is not problematic. The 12–patent set reduction applied only to the 40 patent sets earmarked for foreign distribution. The five patent sets for internal PTO use would not be reduced, nor would other line items of the specifications, such as patent copies ordered by a private company or the weekly *Official Gazette*. Similarly, plaintiff argues that the alleged eleven-set reduction is taken from an average run of 52 patent copies, not 45. Thus, the 41 remaining patent sets would only be four less than the 45–set pricing structure and should not have troubled Mr. Weiss (to the extent that a reduction from 45 to 33 patent sets did). In

his calculations Mr. Weiss did account for the average of 52 copies, but he computed the 12–set reduction on only the sets slated to be reduced—the 40 sets for foreign distribution.

In short, after closely scrutinizing and replicating Mr. Weiss's calculations, the court agrees that a 12–patent set reduction, to affect soft-copy patents for foreign distribution and to occur in the last six months of a ten-month contract, would reasonably result in a 25% reduction in printing needs. Mr. Weiss based his calculations on reasonable assumptions. That he accounted for an error factor of 5% by trimming the reduction to "approximately 20%" is also sensible.

The court must now turn to the nexus between the 20% reduction and the cancellation of the IFB. Mr. Weiss testified that he had three reasons to recommend that the Contract Review Board cancel the solicitation:

Number one was a reduction in the quantity. Number two was a change in the pricing structure, that I had no way to pay for the product. Number three was, I now had a completely revised spec and didn't know how it would affect the rest of the commercial community, who else could have bid on this with the reduced quantity that wasn't able to before. The quantity was much higher, but it was the first two that were primarily in my mind. I had no way to pay for the product that was being reduced, based on the current pricing structure. I could not negotiate, I could not meet with the contractor to find out what we could do.

Q [By plaintiff's counsel] So, you had to pay for 45 no matter how many you used?

A [Mr. Weiss] I had to pay for 45 no matter how few we ordered.

Q Your expectation was that you might be ordering as few as how many?

A Thirty-three as a base number.[10]

■ The GPO Printing Procurement Regulation, ch. XI, § 2(1)(a)–(b) (Oct. 1990), entitled, "Cancellation of Invitation After Opening," governs awards to the responsible

---

10. This number represents the minimum number of patent sets required. The 40 patent sets for foreign distribution were reduced by 12 sets, leaving 28 patent sets, which, when added to the five patent sets for internal PTO use, yield the 33–patent set figure.

bidder with the lowest responsive bid, "unless there is a compelling reason to reject all bids and cancel the invitation." The regulation lists numerous examples of circumstances that may justify canceling an IFB after opening. Three examples apply here: "(i) Inadequate, ambiguous, or otherwise deficient specifications were cited in the IFB[;] (ii) The supplies or services are no longer required ... [; and] (vii) For other reasons cancellation is clearly in the Government's interest." Mr. Weiss explained how each example applied to the changed circumstances of the IFB. First, the pricing structure no longer fit the reduced requirements of the contract, creating an inadequate specification. Second, the requirements had changed from 45 to 33 patent sets. Third, because the specifications had changed, other bidders might be able to submit bids for the reduced quantity of patent sets. The court finds Mr. Weiss' analysis consistent with the procurement regulations and therefore reasonable.

As for the third *Keco II* factor, the Government must not have abused its discretion in canceling the IFB for Program D306–S. "The court should not substitute its judgment on such matters for that of the agency, but should intervene only when it is clearly determined that the agency's determinations were irrational or unreasonable." *CACI Field Servs., Inc. v. United States*, 13 Cl.Ct. 718, 725 (1987) (citations omitted), *aff'd*, 854 F.2d 464 (Fed.Cir.1988); *see also United States Fidelity & Guar. Co. v. United States*, 230 Ct.Cl. 355, 369, 676 F.2d 622, 630 (1982) (treating this factor as a tool to determine "the degree of proof necessary to prove arbitrary and capricious conduct"). In a formal procurement, such as this solicitation, procurement officials are allowed less discretion to perform their duties, as evidenced by the above GPO Printing Procurement Regulation. The court finds that Mr. Weiss did not

abuse his discretion, as there were several compelling reasons to cancel the solicitation.

### 3. *Attorney's fees incurred in defending bid protest*

On December 27, 1993, the incumbent contractor, GraphicData, filed a pre-award bid protest before the General Accounting Office.[11] Although the protest was dismissed, plaintiff incurred legal fees defending itself, which it now seeks to recoup. Plaintiff cites *Crux Computer Corp. v. United States*, 24 Cl.Ct. 223, 225 (1991), in which the court asserted jurisdiction to grant bid protest costs, as well as bid preparation costs. *But see AT & T Technologies*, 18 Cl.Ct. at 323 (suggesting that bid protest costs are not recoverable). The court in *Crux Computer* noted that it "must thus look to *Keco II* for guidance" to determine whether the Government breached its implied-in-fact contract. *Crux Computer*, 24 Cl.Ct. at 226. Therefore, even assuming, *arguendo*, that bid protest costs are recoverable, plaintiff must still prove liability, *i.e.*, that the Government acted in an arbitrary and capricious manner when it canceled the IFB.[12] Because plaintiff has failed to make this showing, the court need not determine whether bid protest attorneys' fees are recoverable and whether *AT & T Technologies* or *Crux Computer* supplies the correct rule of law.

### 4. *Costs incurred in the post-bid proposal "negotiation" phase*

Plaintiff contends that in addition to bid preparation costs, it is also entitled to compensation for "costs incurred during the post bid proposal negotiation phase." This period begins with the low bid determination and culminates in January 1994, when plaintiff was deemed a responsible bidder. Plaintiff argues that this is not a typical IFB; rather, it was a "unique procurement" which combined the requirements of an IFB with those of a Request for Proposal, thus necessitating

---

**11.** GraphicData alleged that 1) plaintiff's bid was not signed by an authorized official and thus was not responsive and 2) plaintiff lacked the necessary facilities to perform the contract.

**12.** As plaintiff notes, in *Finley v. United States*, 31 Fed.Cl. 704 (1994), the court reasserted its position in *Crux Computer* regarding bid protest

costs. While it may be possible to recoup bid protest costs, at least under these cases, recovery still requires that plaintiff "demonstrate[ ] [that] the government did not treat his bid honestly and fairly." *Id.* at 707. This showing is precisely plaintiff's deficiency here.

numerous "proposal" costs for "quality assurance, production planning, security, dedicated staffing, dedicated facilities, quantity, lay-off and connection of required equipment, staff training, etc. prior to GPO's [responsibility determination]." Plf's Br. filed Dec. 8, 1997, at 7–8. Plaintiff notes that "[p]erhaps most importantly, the contract gave the contracting officer the option to have a pre-award pre-production test at the vendor's site." *Id.* at 3. The specification, notes, however, that "[n]o charges will be allowed for costs incurred in the performance of the pre-award test."

Both parties cite *Coflexip & Servs., Inc. v. United States,* 961 F.2d 951, 953 (Fed.Cir. 1992), in which the court held that

> in a negotiated procurement, the costs a contractor incurs *pursuant to ongoing negotiations* with the [G]overnment and in support of a revised proposal, *i.e.,* post-submission costs, can be proposal preparation costs. However, costs which do not support an initial or revised proposal are costs which a contractor incurs in an effort to better position itself to perform any contract it should be awarded. These latter costs, incurred *in anticipation of* contract award are not proposal preparation costs. The contractor assumes the risk that it will not be awarded the contract, and, accordingly, these contract preparation costs will not be recoverable.

While plaintiff argues that it incurred "proposal costs" and engaged in ongoing negotiations with the Government as part of the pre-award survey on January 11 and 12, 1994, defendant contends that plaintiff incurred these costs in order to place it in a position to perform the contract. Defendant is correct, as this was a classic IFB with sealed bids, not a negotiated procurement or an otherwise "hybrid" procurement. The solicitation expressly required a pre-award survey in order to make a responsibility determination; plaintiff's costs following its low-bid submission were incurred pursuant to the responsibility determination and in anticipation of a contract award. Therefore, these costs are not compensable.

To further support its claim, plaintiff cites the GPO's Contract Cost Principles and Procedures, GPO Procurement Directive 306.2, GPO PRA 306.2, § 3, ¶ 26 (Apr. 1, 1988), which states, in pertinent part: "Bid and Proposal (B & P) costs, as used in this subdivision means the costs incurred in preparing, submitting and supporting bids and proposals (whether or not solicited) on potential Government or non-Government contracts." [13] The directive does not further define the word "supporting," so it is unclear whether it includes the sort of post-bid submission costs incurred by plaintiff. "Supporting" just as easily could refer to costs incurred before bid submission as those incurred after. This provision also could merely concern the bid preparation costs sought by plaintiff rather than the more involved "proposal" costs.

Plaintiff also argues that *Crux Computer,* 24 Cl.Ct. at 225, and *AT & T Technologies,* 18 Cl.Ct. at 323, recognize as compensable "the exact efforts that Donnelley expended in order to receive the award." Plf's Br. filed Dec. 8, 1997, at 8. The reasoning behind this statement is unclear in that *Crux Computer* concerned bid protest costs and the court in *AT & T Technologies* noted that "B & P costs ... are the only pre-contract costs recoverable for the government's breach of its implied duty to fairly and honestly consider proposals." 18 Cl.Ct. at 323. Indeed, *Crux Computer, AT & T Technologies,* and *Coflexip & Servs.* all link the recovery of bid protest, bid preparation, or proposal costs to arbitrary and capricious government conduct. Having failed to prove one or more *Keco II* factors, plaintiff is not entitled to compensation for bid preparation, attorneys' fees for bid protest, or proposal costs.

### 5. *Implied-in-fact contract theory*

Based on an implied-in-fact contract theory, plaintiff maintains its entitlement to recover the costs incurred in designing and setting up a production environment, producing pre-production samples, and conducting a pre-award production system test pursuant

---

**13.** This is the same definition for Bid and Proposal costs as that given by the cost principles in the Federal Acquisition Regulation. 48 C.F.R. § 31.205–18(a) (1996).

to the responsibility determination requirements.

 Regarding the evidence generally required to support an implied-in-fact contract, the Court of Claims stated:

> A contract implied in fact requires a showing of the same mutual intent to contract as that required for an express contract. The fact that an instrument was not executed is not essential to consummation of the agreement. It is essential, however, that the acceptance of the offer be manifested by conduct that indicates assent to the proposed bargain. The requirements of mutuality of intent and the lack of ambiguity in offer and acceptance are the same for an implied-in-fact contract as for an express contract; only the nature of the evidence differs.

*Russell Corp. v. United States,* 210 Ct.Cl. 596, 609, 537 F.2d 474, 482 (1976) (footnotes omitted). "Mutuality is inferred 'from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" *Sperry Corp. v. United States,* 13 Cl.Ct. 453, 458 (1987) (quoting *Baltimore & Ohio R.R. v. United States,* 261 U.S. 592, 597, 43 S.Ct. 425, 427, 67 L.Ed. 816 (1923)).

Plaintiff argues that the GPO urged it to proceed as quickly as possible to ensure that the new production facility was ready to take printing orders within 30 days of contract award. The GPO made a responsibility determination on or around January 28, 1994, and plaintiff argues that contract award was conditioned on its readiness to produce under the approved plans and in the approved facility within 30 days of award. Plaintiff likens this case to *Sperry,* where the defendant agency requested accelerated production and delivery of the subject of the contract absent a follow-on contract. Here, however, the pre-award survey did not require plaintiff to perform more work than that anticipated by the specifications, nor did the GPO pre-award survey team or the contracting officer's requirement of readiness relate to a separate contract. Rather, plaintiff understood that the 30-day readiness requirement was part and parcel of the IFB.

## CONCLUSION

Accordingly, based on the foregoing, the Clerk of the Court shall enter judgment for defendant.

**IT IS SO ORDERED.**