**CALIFORNIA MARINE CLEANING, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**Pacific Tank Cleaning Services, Inc., Defendant–Intervenor.**

No. 98–636C.

United States Court of Federal Claims.

Oct. 22, 1998.

---

Patrick K. O'Keefe, Washington, D.C., for plaintiff, with whom were David Kasanow, Washington, D.C., and Lane L. McVey, San Diego, California, and Domenick A. Gallo, San Diego, California, of counsel.

Karin M. Norington, U.S. Department of Justice, Washington, D.C., with whom were Assistant Attorney General Frank W. Hunger, Director David M. Cohen, and Assistant Director Anthony H. Anikeeff, U.S. Department of Justice, Washington, D.C., and Richard G. Welsh, Naval Facilities Engineering Command, Washington, D.C., of counsel, for defendant.

C. Patrick Callahan, San Diego, California, for defendant-intervenor Pacific Tank Cleaning Services, Inc.

## OPINION

BRUGGINK, Judge.

This is an action brought pursuant to the court's bid-protest jurisdiction. *See* 28 U.S.C. § 1491(b)(1) (Supp. II 1996). It is unusual in that what started as a challenge to the imminent award to another bidder has evolved into a challenge to the cancellation of the solicitation. Plaintiff California Marine Cleaning, Inc. ("California Marine") submitted a bid in response to a solicitation by the United States Department of the Navy ("Navy") for hazardous waste removal services. For reasons that are disputed by the two bidders, the Navy first discovered California Marine's bid in the bid depository six days after bid opening. California Marine's bid price was lower than that of the lowest bidder announced at the bid opening, Pacific Tank Cleaning, Services, Inc. ("Pacific Tank"). After the Navy announced it would consider California Marine's bid for award, Pacific Tank filed a protest with the agency. The Navy denied Pacific Tank's protest, and Pacific Tank subsequently filed a protest with the General Accounting Office ("GAO"). GAO sustained the protest and recommended

that the Navy award the contract to Pacific Tank. As a result, the agency began preparations to award the contract to Pacific Tank. California Marine then filed this bid-protest action.

In its original complaint, California Marine sought an injunction to prevent the Navy from awarding the contract to any bidder other than itself. After learning of this bid-protest action, however, the Navy announced its decision to cancel and resolicit the procurement. California Marine subsequently amended its complaint to add a second count, challenging the validity of the cancellation. Pacific Tank thereafter intervened, seeking an injunction directing the Navy to reinstate the solicitation and award the contract to Pacific Tank. Pending are the Government's motion for judgment on the administrative record, and plaintiff's and defendant-intervenor's cross-motions for summary judgment. The court heard oral argument on October 19, 1998. For the reasons set forth herein, the Government's motion for judgment on the administrative record is denied, defendant-intervenor's cross-motion for summary judgment is denied insofar as it seeks award of the contract to Pacific Tank, and plaintiff's cross-motion for summary judgment is granted.

## BACKGROUND [1]

On December 9, 1997, the Officer in Charge of Construction ("OICC") Navy Public Works Center ("NPWC") in San Diego, California, issued Solicitation N63387–96–B–3145. The solicitation requested bids for "hazardous waste bulk pumping and transporting for various naval activities in San Diego, California." The instructions on the first page of the solicitation permitted bidders to submit bids by mail or hand-delivery. Under the latter option, bidders were directed to deliver hand-carried bids to the depository located in Building 291 of the Naval

---

1. The facts are drawn from the administrative record filed with the court on August 18, 1998, and as later supplemented by leave of the court. The background facts necessary to resolve the issue of the reasonableness of the decision to cancel the solicitation are undisputed. There is a dispute between the contractors as to the time-liness of plaintiff's bid. The parties agreed, however, after the court initially scheduled trial, to submit that dispute, as well as the broader question of the reasonableness of the agency's action, on the existing record. Ultimately, it is only the inferences to be drawn from undisputed facts as to which the contractors disagree.

Station in San Diego by 10 a.m. on January 8, 1998. The depository—commonly referred to as the "bid box"—was located on the floor in the reception area of Building 291. The bid box resembled a mailbox in physical appearance and dimensions: It was approximately two feet wide, two feet deep and two and a half feet high; on the sloping top front of the box was a mail slot about one inch wide and nineteen inches long in which bids could be deposited. A door on the front of the box could be opened to remove bids, but at all other times was secured by a combination lock. This bid box is designated as the depository for hand-carried bids for numerous solicitations issued by the NPWC.

A desk is also located in the reception area, staffed from 7:00 a.m. each business day by a receptionist. The receptionist did not keep any record of bids as they were delivered. Instead, bidders or couriers were required to obtain a time and date stamp on submitted bids. A time/date stamp device was located near the bid box in the reception area. Although the general procedure for time and date stamping bids is not entirely clear,[2] it was not uncommon for persons delivering bids to stamp their bids themselves and then deposit the bids in the bid box.[3] As a security measure, persons entering Building 291 customarily are required to sign a visitor log and record the date and time of their arrival and departure.[4]

Joseph Jacobs, contracts manager for California Marine, asserts in his affidavit that he assisted in preparing California Marine's bid on January 7, 1998 and then took the sealed bid to the Naval Station on the following morning. He also recites (and the agency later found) that on the morning of January 8, 1998, the date of bid opening, he arrived at the Naval Station and signed in at the guard desk at 8:37 a.m. He states that he entered Building 291 and stamped California Marine's bid envelope using the time and date stamp device near the bid box. The stamp on the bid envelope recorded the time as 8:38 a.m. Mr. Jacobs asserts that he then deposited the bid in the bid box. He then left the building and signed out at the guard desk at 8:40 a.m.[5] California Marine's bid was in the amount of $2,587,250.

2. Plaintiff asserts: "Bidders are required to stamp their bids with the date and time, and then place the bid in the depository. This is the standard practice that has been used by NPWC for many years." First Amended Complaint ¶ 22. The Government admitted this allegation only to the extent supported by the administrative record, and that record is silent as to the standard practice for stamping bid envelopes at Building 291. It is clear. however, that bidders had access to the time/date stamp device to stamp their own bids.

3. The Navy has informed the court that bid submission procedures have been modified subsequent to this protest in an attempt to prevent a recurrence of the events that occurred in this protest.

4. After an inquiry into the circumstances surrounding this bid-protest, the contracting officer determined that "all persons entering Building 291 are required to sign a visitor log indicating the date and their arrival and departure times." See Def.'s Statement of Facts ¶ 19.e. Defendant–Intervenor Pacific Tank contends, however, that visitors could access the building without signing the visitor log by entering the Naval Station via the main entrance rather than the entrance closest to Building 291. In fact, Ricardo Beas, Pacific Tank's President, stated in his affidavit that he visited Building 291 on one occasion without having to sign the visitor log. See Admin. R., tab 35, enclosure A at 3–4. Neither the plaintiff nor the Government challenge the assertion that the visitor log is not a comprehensive record of all visitors to the building. Moreover, Pacific Tank's claim is supported by a review of the administrative record. The bid opening attendance sheet for this solicitation shows that two representatives of Southbay Sandblasting & Tank Cleaning—Roger Gruben and Canuto Lopez—were present at the bid opening, yet neither person is recorded in the pages of the visitor log that were incorporated into the administrative record.

5. The visitor log indicates a departure time of 9:40 a.m. for Mr. Jacobs. However, in his affidavit Mr. Jacobs states that he departed "approximately five minutes" after his arrival at 8:30 a.m. See Admin. R., tab 24 at 1. Relying on this affidavit, and sworn statements of government employees that no-one was observed loitering in or around Building 291 for the more than one-hour period from 8:37 a.m. to 9:40 a.m., the contracting officer concluded that the 9:40 a.m. entry in the visitor log reflects a "clerical error" and that Mr. Jacobs' "actual time of leaving was approximately 8:40 AM." See id., tab 27 at 2. Neither the Government nor Pacific Tank dispute the accuracy of this portion of Mr. Jacobs' affidavit. The court agrees with the agency's finding that Mr. Jacobs departed Building 291 at approximately 8:40 a.m.

Pacific Tank's position here is based on the necessary premise that this recitation is false. Although it has never directly alleged fraudulent conduct by California Marine or its officers or employees,[6] in substance, Pacific Tank alleges that Mr. Jacobs entered the facility with an empty envelope, stamped the envelope at 8:38 a.m., and then returned to California Marine's offices with the envelope. This stratagem would have allowed California Marine to complete its bid after bid opening in light of the publicly-disclosed bid prices of the other bidders. Under Pacific Tank's theory, an officer or employee of California Marine presumably then deposited the bid in the bid box at some later date without being observed by the receptionist in the reception area.

After Mr. Jacobs' departure, several contractor representatives arrived at Building 291 to submit bids or to witness the bid opening. Just before 10:00 a.m., Patty Olivas, a Contract Specialist in the Contracts Department at NPWC and supervisor of the bid opening, and Denise Holloway, a Procurement Technician in the same department, went to the reception area to administer the bid opening. A third procurement official, Elia Martinez, who was also a Contract Specialist in the Contracts Department, assisted Ms. Olivas and Ms. Holloway with the bid opening. In addition, Sandra Nixon, the Contracts Department receptionist, and representatives of several bidders were present in the reception area.

At 10:00 a.m., Ms. Holloway stated that the time for receipt of bids had closed and asked the contractor representatives to move into a conference room next to the reception area to witness the public opening of bids. Ms. Martinez and the contractor representatives left the reception area and took seats at the table in the conference room. Ms. Holloway then unlocked the bid box, removed envelopes, and quickly sorted through them to find the bids relating to the hazardous waste removal services solicitation.[7] She identified five bid envelopes relating to the solicitation and handed them to Ms. Olivas. Ms. Olivas asked "Is that all of them?" Ms. Holloway replied in the affirmative. Ms. Holloway then returned the remaining envelopes to the box. Her best recollection is that she returned at least two, but no more than four, bids to the box. Although Ms. Holloway states that she checked that the bids returned to the box were not marked for the hazardous waste removal services procurement, the entire process of sorting and checking bids did not take more than thirty seconds. She then closed and locked the box.

Ms. Olivas and Ms. Holloway carried the five bids into the conference room. They were then opened and recorded. The abstract of offers reflects the following bids:

| Bidder | Total Contract Price |
| --- | --- |
| Pacific Tank Cleaning Services, Inc. | $2,891,185.00 |
| Southbay Sandblasting & Tank Cleaning | $3,028,969.20 |
| Blue Sky Remediation Services, Inc. | $3,864,025.00 |
| American Processing Company, Inc. | $4,021,207.56 |
| Island Environmental Services, Inc. | $4,128,825.00 |

Representatives from four of these bidders were present at the bid opening,[8] but no

6. The GAO decision sustaining Pacific Tank's protest refers to "protester's theory that, while the bid envelope was time/date stamped on January 8, this envelope may have been deposited on the afternoon of January 14." *Pacific Tank Cleaning Services, Inc.*, 98–2 C.P.D. ¶2 at 4. Pacific Tank has not stated explicitly this theory before this court.

7. The bid box was designated as the depository for a number of solicitations. To ease identification, bidders were required to mark the solicitation number and the date and time for bid opening on the envelopes containing their bids. However, there is no evidence in the record that the Navy conducted more than one bid opening on January 8, 1998.

8. Although the attendance sheet does not indicate that a representative from Island Environmental Services attended the bid opening, a subsequent investigation by the contracting officer determined that the company's representative arrived after 10:00 a.m. and witnessed the record-

representative from California Marine was in attendance. The results were posted on the bid board in the Contracts Department in Building 291 at approximately 1:30 p.m.

At approximately 3:00 p.m. on the bid opening date, Matthew Carr, the President and CEO of California Marine, left a voice mail message for David Welch, a Contract Specialist in the Contracts Department and the designated contact person for the solicitation, inquiring when the results of the bid opening would be available. Mr. Welch was away on emergency leave and no one in the Contracts Department checked his voice mail.

On January 14, 1998, having received no response from the Navy, Mr. Carr decided to visit the Naval Station to view the bid results posted in Building 291. Mr. Carr and Mr. Jacobs drove to the Naval Station and signed in at the guard desk at approximately 2:30 p.m.[9] They viewed the bid board and discovered that the posted low bid for the procurement was that of Pacific Tank. They also noted that California Marine's bid was not listed among the bids opened for that procurement.

Mr. Carr states in his affidavit that he and Mr. Jacobs returned immediately to California Marine's office, whereupon Mr. Carr called the Contracts Department to inform the agency that California Marine had submitted a bid lower than that of the published lowest bidder, Pacific Tank.[10] Pacific Tank, however, suggests indirectly that Mr. Carr and Mr. Jacobs took this opportunity to complete the second part of California Marine's alleged fraudulent scheme to submit a late bid. It implies that the two men took a blank bid form and the bid envelope that had been stamped on January 8 with them into the building that afternoon, completed California Marine's bid after viewing the bid prices displayed on the bid board, sealed it in

the envelope, and then deposited the bid in the bid box in the reception area. It offers no direct evidence to support that surmise.

The visitor log reveals that Mr. Carr and Mr. Jacobs signed out at 2:35 p.m., approximately five minutes after their arrival. After returning to his office, Mr. Carr again tried to contact Mr. Welch by telephone, and again reached his voice mail. At approximately 2:44 p.m., Mr. Carr left a message on Mr. Welch's voice mail stating that he did not understand why the Navy had listed Pacific Tank as the low bidder in view of the fact that California Marine had submitted a lower bid.

Shortly before 3:00 p.m., having received no response from Mr. Welch, who was still out on emergency leave, Mr. Carr telephoned Barbara McCanna, a Contract Specialist at NPWC who had been designated as an alternate contact person for the procurement, and conveyed to her the same information he had left in his voice mail message for Mr. Welch. After confirming that California Marine's bid was not in the contract file or recorded on the abstract of bids, Ms. McCanna agreed to investigate the matter further. She directed Ms. Holloway to open the bid box. They discovered California Marine's bid beneath two other loose bids at the front of the bid box.[11] California Marine's bid was time and date stamped 8:38 a.m. on January 8, 1998. Ms. McCanna asked if it was possible that Ms. Holloway had overlooked the bid on the date. Ms. Holloway replied that it was possible but she could not understand how, considering the small number of bids submitted. Upon opening the envelope, Ms. McCanna discovered that California Marine's bid price was $2,587,250, more than $300,000 below Pacific Tank's bid.

Ms. Nixon, the receptionist stationed near the bid box, was shown the bid envelope and recognized the handwriting from that morn-

---

ing of bids, but forgot to sign the attendance sheet. The visitor log confirms this account.

9. Mr. Carr noted his arrival time as "2:26 [p.m.];" Mr. Jacobs stated his arrival time as "14:30."

10. The Government admits the relevant allegations in California Marine's First Amended Com-

plaint "to the extent supported by the Administrative Record." Def.'s Answer ¶¶ 39–40.

11. The bid box also contained a bundle of envelopes held together by an elastic band and marked "Do not take apart[;] old bids for specialist to claim[.] DH 7/15/97."

ing when she had opened the bid box and sorted through the bids at the request of Jo Flores, a NPWC purchasing agent. Ms. Flores had asked Ms. Nixon to retrieve a bid submitted the previous day regarding an unrelated procurement. Ms. Nixon opened the bid box, sorted through a number of loose bids in the box, and retrieved a bid date-stamped January 13, 1998 for Ms. Flores. Although she did not specifically remember seeing California Marine's name on any of the bids in the bid box that morning, she remembered seeing an envelope with the same distinctive handwriting.[12]

After questioning Mr. Carr about the events surrounding the submission of California Marine's bid, and in light of the time and date stamp on the bid envelope, Ms. Holloway's admission that she may have overlooked the bid, and the significant difference between the bid prices of California Marine and Pacific Tank,[13] the Navy decided later that same day it would consider California Marine's bid for award.

12. In a brief memorandum to Ms. McCanna dated January 22, 1998, Ms. Nixon stated that she remembered seeing this bid envelope on top of the other bids in the bid box. *See* Admin. R., tab 26, attach. (1). On February 19, 1998, she prepared another memorandum, which informed Ms. McCanna: "I am no longer positive that [California Marine's] envelop [sic] was on top. *The only thing that I am sure of is that the envelope was in the box on the morning of January 14th.*" *See id.*, attach. (2) (emphasis added).

Ms. Nixon's subsequent affidavit, sworn to on April 7, 1998, provided a thorough statement of her recollection of events on January 8 and January 14. Regarding her observation of California Marine's bid in the bid box on the morning of January 14 she stated: "On reflection, I cannot say for sure that I saw the California Marine Cleaning, Inc. bid on top of the other bids when I opened the bid box on 14 January 1998. *All I am sure of today is that I did see the bid in the bid box when I opened the box that morning.*" *Id.*, tab 26 at 1 (emphasis added).

13. In her memorandum for the record, dated January 22, 1998, Ms. McCanna stated that she and two other NPWC Contracts Department staff concluded that California Marine's bid price "is not suspiciously close to the apparent low bidder." Admin.R., tab 12 at 2.

14. These two envelopes apparently were both deposited in August 1997. The first, a bid submitted by Spa Plumbing, Inc. and date-stamped on August 4, 1997, had been submitted in re-

On January 15, 1998, an employee in the Contracts Department checked Mr. Welch's voice mail and learned of the two messages left by Mr. Carr on January 8 and January 14. Also on January 15, Ms. McCanna, with the assistance of Ms. Holloway and another government employee, re-opened the bid box to investigate the contents of the bid box. This investigation revealed that the two loose bids found on top of California Marine's bid on the afternoon of January 14 were submitted in response to prior solicitations and predated January 8, 1998.[14] Ms. McCanna telephoned Ricardo Beas, President of Pacific Tank, and informed him of the discovery of California Marine's bid, and that the agency considered California Marine as the low bidder in line for contract award.

On January 16, 1998, Pacific Tank filed a protest with the Navy challenging its decision to consider California Marine's bid. In its protest, Pacific Tank asserted that California Marine's bid could not have been timely filed prior to bid opening because it had

sponse to solicitation number N63387–96–B–4228. Bid opening for that procurement occurred on August 6, 1997. The second item was an offer submitted by Orbas & Associates in response to solicitation number N63387–94–B–3924. The deadline for receipt of offers in that procurement was August 28, 1997. The offer apparently was not date-stamped but presumably was deposited sometime in August 1997.

The Spa Plumbing bid is of particular note to this protest. Ms. Holloway stated in her affidavit that she opened the bid box and collected the bids for that procurement on August 6, 1997. Obviously, because the bid was still in the bid box on January 15, 1998, the bid was either (1) deposited on August 4, prior to bid opening, but overlooked by Ms. Holloway at the bid opening on August 6, or (2) date-stamped prior to bid-opening but not deposited after bid opening, following the stratagem that Pacific Tank implicitly attributes in this action to California Marine. As in the present case, there simply is no evidence to support the latter explanation; rather, the obvious inference is that Ms. Holloway mistakenly overlooked the bid, in the same manner that she overlooked California Marine's bid on January 8, 1998.

The court notes that the presence of the Spa Plumbing and Orbas & Associates envelopes in the bid box five months after the scheduled submission dates further indicates the lack of careful scrutiny given to bid envelopes by NPWC staff at bid openings, at least during the time period from August 1997 to January 1998.

not been found in the bid box at the bid opening. On that same day, in an effort to demonstrate that its implied theory of fraudulent conduct by California Marine was credible, Mr. Beas directed a Pacific Tank employee to 're-enact' the hypothesized actions of Mr. Jacobs on January 8. The Pacific Tank employee took a blank envelope into Building 291, stamped the envelope using the time/date stamp device, and then exited the building without depositing the envelope in the bid box. The receptionist did not question the employee about his actions.

In response to the agency protest, the Navy conducted an investigation of the events surrounding the receipt of bids for the procurement. Ms. McCanna ascertained that the bid box had been opened only once between the bid opening on January 8 and the discovery of California Marine's bid on January 14—on the morning of January 14, when Ms. Nixon opened the bid box at the request of Ms. Flores in connection with a different solicitation. Ms. McCanna obtained sworn statements from Mr. Carr and Mr. Jacobs regarding the submission of California Marine's bid, and statements from the government employees involved with the procurement regarding their recollection of events relevant to the protest. Ms. McCanna also confirmed that the visitor log showed only two visits by California Marine employees to Building 291 in the time period in question—on the morning of January 8 and the afternoon of January 14—consistent with the affidavits of Mr. Carr and Mr. Jacobs.

After weighing all of this information, Robert Smith, the contracting officer,[15] concluded that California Marine had timely submitted its bid on January 8 and prepared a letter denying Pacific Tank's protest, dated March 12, 1998. His decision rejected Pacific Tank's claim that California Marine's bid could not have been in the bid box at the time of bid opening because it had not been read by the bid opening officer. The contracting officer stated that Ms. Holloway, the person who removed the bids from the bid box and sorted through the bids, may have overlooked California Marine's bid in the bid

box, but "[t]he most likely explanation, given by [Ms. Holloway], is that she misread the bid label while quickly sorting through the bids." *Id.*, tab 27 at 2. The decision noted that Ms. Holloway "admits that in her haste to remove, sort and hand the bids to the bid opening officer, she may have accidentally returned the Cal Marine bid to the bid box. Because of the absence of [Mr. Welch] (and due to no fault of Cal Marine), the apparent error was not discovered until some time later." *Id.* at 4. The contracting officer also cited the difference in price between the bids of California Marine and Pacific Tank as further evidence of the legitimacy of California Marine's bid: "If Cal Marine's intention were to submit a winning bid after learning of the prices of its competitors, it seems unlikely that the bidder would choose to leave more than $300,000 ... 'on the table.'" *Id.* at 3. Considering all of these factors, Mr. Smith concluded that California Marine's had timely filed its bid.

Pacific Tank filed a timely protest of the Navy's proposed award to California Marine with the GAO on March 23, 1998. As in its agency protest, Pacific Tank's protest letter asserted that California Marine's bid could not have been timely submitted because it had not been opened or recorded at the public bid opening. In essence, Pacific Tank argued that the Navy contracting personnel could not have overlooked California Marine's bid.

On April 22, 1998, the Navy submitted an agency report to GAO responding to Pacific Tank's protest letter. In preparation for this response, the agency obtained affidavits from all of the key employees mentioned above. In her affidavit, Ms. Holloway stated:

> To this day, I do not recall seeing Cal Marine's bid in the bid box when I opened the box on 8 January 1998. . . .
>
> Given the small number of bids in the bid box on 8 January 1998, I do not see how I could have missed the Cal Marine bid, but it is possible that I did. In gathering the bids from the box I sorted through them quickly—I did not want to hold up the bid opening as the contractors

---

**15.** At some point between March 12, 1998, and August 17, 1998, Oralee Martin replaced Mr. Smith as the contracting officer on this procurement.

were already waiting in the conference room—and may have mis-read the solicitation number on the Cal Marine bid envelope and for that reason put the envelope back into the box as belonging to another procurement. . . .

I can recall a couple of times before that I accidentally overlooked a bid for a bid opening.

*Id.*, tab 6 at 2.[16] The agency report recited the evidence supporting its conclusion in the agency protest that California Marine's bid had been timely received: the time/date stamp on the bid; Ms. Holloway's admission that she may have overlooked the bid in the haste to sort through the bids; and the telephone inquiry by Mr. Carr on the afternoon of January 8 regarding the status of the procurement. The report raised two additional pieces of evidence not mentioned in the agency's March 12, 1998 decision. First, Ms. Holloway's admission in her affidavit, quoted above, that she had overlooked bids "a couple of times before." *Id.*, tab 2 at 6. The report noted evidence of such an occurrence in August 1997.[17] Second, the agency commented that "an examination of Cal Marine's bid envelope reveals that the last four digits of the solicitation number on the envelope are difficult to read, making it quite possible for the bid clerk to have mis-read them during her sorting of the bids." *Id.* For all of these reasons, the agency urged that the GAO should deny Pacific Tank's protest and uphold the Navy's decision in the agency protest.

The GAO nevertheless sustained Pacific Tank's protest on July 1, 1998 and recommended that the Navy reject California Marine's bid as late and award the contract to Pacific Tank. Applying the late bid rules set out in the Federal Acquisition Regulations ("FAR"), GAO concluded that the time and date stamp on California Marine's bid could not be accepted because the time/date stamp device was accessible to the public. Having discarded that evidence, the GAO considered the statements of the agency personnel. It

noted that Ms. Holloway's affidavit failed to establish the timeliness of California Marine's bid, focusing on her comment that " 'I do not see how I could have missed the Cal Marine bid.' " *Pacific Tank Cleaning Services, Inc.*, 98–2 C.P.D. ¶ 2, at 4. The decision did not address, however, any of the evidence—including the admission in Ms. Holloway's affidavit—regarding previous incidents at the NPWC in which bids had been overlooked. The GAO concluded:

On this record, the scenario posited by the protester is no less plausible than the agency's position that the technician [Ms. Holloway] overlooked a bid while sorting through very few bids in the bid box.

In short, there is no acceptable evidence which establishes that Cal Marine's bid was received at the installation prior to bid opening. . . .

*Id.* at 4–5.

The Navy did not adopt immediately the GAO's recommendation. Instead, the agency apparently mulled over its possible courses of action. On July 13, 1998, California Marine filed a request for reconsideration with the GAO. California Marine alleged that the GAO had misapplied the FAR late bid rule, *see* 48 C.F.R. § 14.304–1 (1997),[18] by concluding that the time and date stamp on its bid was not acceptable evidence to establish the timeliness of its bid. It asserted that the GAO on reconsideration should find that its bid was timely and direct award of the contract to California Marine as the lowest bidder. In the alternative, California Marine argued that if the GAO had correctly determined that the bidding procedure "was not secure, the proper remedy is to invalidate the entire process and require the Navy to resolicit bids" rather than to recommend award to Pacific Tank. Admin. R., tab 38 at 2.

At some time in July 1998, the Navy began leaning toward following the GAO recommendation and awarding the contract to Pacific Tank. The agency engaged in discussions with Pacific Tank regarding a pre-

---

**16.** Statements from Ms. Nixon's affidavit are quoted elsewhere in this opinion. *See supra* note 12.

**17.** *See supra* note 14.

**18.** Unless otherwise stated, all citations to Title 48 of the C.F.R. refer to the October 1, 1997 edition.

award survey. On July 16, 1998, Mr. Welch provided Pacific Tank with written confirmation of a proposed pre-award survey of Pacific Tank's facility on July 22, 1998, which Mr. Welch had earlier discussed with Mr. Beas by telephone.

On August 6, 1998, California Marine filed this bid-protest action to enjoin the award of the contract to Pacific Tank or any bidder other than itself.[19] The complaint alleged that the Navy intended to follow the GAO recommendation, reject California Marine's bid, and award the contract to Pacific Tank. California Marine asserted that the GAO decision was irrational and thus the Navy's decision to follow that recommendation was arbitrary, capricious, and an abuse of discretion. Plaintiff sought preliminary and permanent injunctive relief.

The following day, the Navy announced to the court that it had decided not to follow the GAO recommendation, but would instead discuss settlement options with California Marine and Pacific Tank. On August 13, 1998, after the Navy announced that it intended to cancel the solicitation and resolicit the contract during a telephone status conference with the court, this court denied the plaintiff's motion for a preliminary injunction as moot.

Four days later, on August 17, 1998, the Navy issued its final decision to date, notifying Pacific Tank that it was canceling the solicitation and would later issue a new solicitation. As grounds for its decision, the Navy stated:

> The Government's final decision regarding the subject solicitation is to cancel in accordance with the [FAR] 14.404–1(a)(1) and 14.404–1(c)(10). . . .
>
> In its decision of July 1, 1998, the General Accounting Office (GAO) implicitly found the agency's practice of placing the bid box in the reception area and allowing bidders to date stamp their own bids undermined the integrity of the bid system. If the system lacks integrity then the entire system is tainted by that lack of integrity. In the Contracting Officer's view there is then

only one appropriate remedy, resolicitation.

Contracting officer's letter of Aug. 17, 1998. at 1.

California Marine subsequently amended its complaint to add a second count, which asserts that the Navy's decision to cancel the procurement did not comply with the FAR, and was arbitrary, capricious. without rational basis, and an abuse of discretion. The defendant-intervenor joins in the attack on the cancellation but urges the court to adopt the GAO's recommendation to award the contract to Pacific Tank.

## DISCUSSION

The mutability of the agency's position as to this procurement makes this a peculiar dispute. This is not a simple bid-protest action in which a single final agency decision is challenged and under review by the court. The 'final' decision by the Navy here, at this point in time, is its decision of August 17, 1998, to cancel the procurement—a decision taken *after* the initiation of this action. That decision departed from two earlier positions taken by the agency. Initially, the agency determined that California Marine's bid was timely and, therefore, award should be made to California Marine as the low responsive bidder. The Navy denied Pacific Tank's protest of that decision. If Pacific Tank had then protested the agency decision to this court, the court would not have hesitated to uphold the Navy's decision, for reasons that will become apparent below.

The Navy's second position, reached after the GAO sustained Pacific Tank's protest, was to proceed with a pre-award survey of Pacific Tank in preparation for an award to that company. Realizing that the award of the contact to Pacific Tank was perhaps imminent, California Marine filed this protest action, seeking to enjoin the award of the contract to Pacific Tank. If, as it apparently considered doing, the Navy had awarded the contract to Pacific Tank and this court were now considering the validity of the agency's

---

19. As a result of the filing of this bid-protest, the GAO dismissed California Marine's request for reconsideration. *See California Marine Cleaning,* *Inc.—Reconsideration,* B–279111.3, 98–2 C.P.D. ¶ —— (Comp.Gen. Aug. 13, 1998).

decision to follow the GAO recommendation, the court would have concluded that such action was arbitrary and capricious because the underlying GAO decision was irrational. *See Honeywell, Inc. v. United States,* 870 F.2d 644, 647 (Fed.Cir.1989).

Instead, after California Marine filed this action, the Navy reconsidered its position and adopted a third approach. The agency decided not to award the contract to either Pacific Tank or California Marine, but rather to reissue the solicitation. California Marine amended its complaint to add a count challenging this final decision. This court must now struggle with the untidy aftermath of the Navy's vacillations over the past months.

Even though the Navy's decision to cancel the solicitation was taken after the commencement of this suit, the court agrees with the defendant that both the preliminary and ultimate issue before the court is the validity of the cancellation decision. As a matter of necessity, however, consideration of that decision will entail a review of the GAO's recommendation and a discussion of the issue of the timeliness of California Marine's bid.

## I. The Cancellation Decision

### A. Jurisdiction

This court has jurisdiction to hear bid-protest disputes pursuant to the Tucker Act. *See* 28 U.S.C. § 1491(b) (Supp. II 1996). The Administrative Disputes Resolution Act of 1996 ("ADRA") amended the Tucker Act and expanded this court's jurisdiction in several respects. *See* Pub.L. No. 104–320 § 12(a), 110 Stat. 3870, 3874–75 (1996). Under the amended bid-protest statute this court now has "jurisdiction to render judgment on an action by an interested party objecting to . . . any alleged violation of statute or regulation

in connection with a procurement or a proposed procurement." *See* 28 U.S.C. § 1491(b)(1) (Supp. II 1996). This statutory provision grants this court jurisdiction to address California Marine's protest of the cancellation of the solicitation because its protest is founded upon an alleged violation of FAR 14.404–1, 48 C.F.R. § 14.404–1, which prescribes the circumstances under which the Government may cancel a solicitation after bid opening.

### B. Standard of Review

This action is presently before the court on defendant's motion for judgment on the administrative record and the plaintiff's and defendant-intervenor's cross-motions for summary judgment. Motions for judgment on the administrative record are treated in the same manner as motions for summary judgment. *See Nickerson v. United States,* 35 Fed.Cl. 581, 588 (1996), *aff'd without opinion,* 113 F.3d 1255 (Fed.Cir.1997). This court may grant motions for summary judgment only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Regarding the latter, the 1996 amendments to the Tucker Act provide that this court must apply the standard of review prescribed in section 10(c) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (1994). *See* 28 U.S.C. § 1491(b)(4) (Supp. II 1996). That section authorizes a court to hold unlawful and set aside agency action, findings, and conclusions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1994).[20]

---

**20.** The District of Columbia Circuit, which has reviewed bid-protests under the APA standard since it recognized that disappointed bidders have standing to challenge agency procurement decisions in *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970), has interpreted the APA standard of review as requiring the protester to show "either that (1) the procurement official's decisions on matters committed primarily to his own discretion had no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable

statutes or regulations." *Kentron Haw., Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973).

The Federal Circuit and its predecessor, the Court of Claims, formulated a four-factor test for determining whether agency conduct is arbitrary or capricious in the context of bid-protests: "Those factors are: (1) subjective bad faith on the part of the government; (2) absence of a reasonable basis for the administrative decision; (3) the amount of discretion afforded to the procurement officials by applicable statutes and regulation; and (4) proven violations of pertinent

## C. The Merits

The determinative issue is whether the agency's decision to cancel the solicitation was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. It bears emphasis at the outset that this was a sealed bid procurement and the bids had been opened. The FAR explicitly addresses this circumstance at section 14.404–1. In pertinent part that section provides:

(a)(1) Preservation of the integrity of the competitive bid system dictates that, after bids have been opened, award must be made to that responsible bidder who submitted the lowest responsive bid, unless there is a *compelling reason* to reject all bids and cancel the invitation.

. . . .

(c) Invitations may be canceled and all bids rejected before award but after opening when, consistent with paragraph (a)(1) above, the agency head determines in writing that—

. . . .

(10) For other reasons, cancellation is *clearly in the public's interest.*

48 C.F.R. § 14.404–1 (1997) (emphasis added). Section 214.404–1 of the Department of Defense FAR Supplement ("DFARS") in turn delegates the authority to make the written determination required above to the contracting officer. *See id.* § 214.404–1.

Plaintiff alleges in count II that the Navy's decision was neither "clearly in the public's interest" nor justified by a "compelling reason." Neither of these terms is defined by the FAR. The compelling reason justification appears to codify a judicially-created standard established by the Court of Claims:

The Government is required by law to award certain of its contracts on the basis of competitive bids, after advertisement. To make the system work without undue

delays and without the opining of the bids being used unfairly to obtain a disclosure of what competitors are offering, it is necessary that the bids be firm bids, backed by a guaranteed willingness to sign a contract at the bid price. To have a set of bids discarded after they are opened and each bidder has learned his competitor's price is a serious matter, and it should not be permitted except for cogent reasons.

*Massman Constr. Co. v. United States,* 102 Ct.Cl. 699, 719, 60 F.Supp. 635, 643, *cert. denied,* 325 U.S. 866, 103 Ct.Cl. 800, 65 S.Ct. 1403, 89 L.Ed. 1985 (1945). The FAR itself explicitly recognizes that the "compelling reason" standard is necessary to preserve "the integrity of the competitive bid system." 48 C.F.R. § 14.404–1(a)(1). This court has commented that, after bid opening, bids "have been exposed to their competitors and will constitute 'sitting ducks' to serve as targets for competitors in the next round of bidding. Certainly, such a situation tends to undermine the integrity of the bidding process, which [FAR 14.404–1] is designed to foster and protect." *P. Francini & Co. v. United States,* 2 Cl.Ct. 7, 10 (1983); *accord Prineville,* 859 F.2d at 912; *Vanguard Sec., Inc. v. United States,* 20 Cl.Ct. 90, 102, 112–13 (1990). The GAO has likewise emphasized the potential impact on the integrity of the bidding process:

Although a contracting officer has broad discretion to cancel an invitation, there must be a compelling reason to do so *after* bid opening, because of the potential adverse impact of cancellation on the competitive bidding system after prices have been exposed. The fact that a solicitation is defective in some way does not justify cancellation after bid opening if award under the IFB would meet the government's actual needs and there is no showing of prejudice to other bidders.

*R.R. Donnelley & Sons, Co. v. United States,* 40 Fed.Cl. 277, 282 (1998). Moreover, the third *Keco* factor is a tool for determining "the degree of proof necessary to prove arbitrary and capricious conduct" rather than an independent basis for determining arbitrary and capricious action. *United States Fidelity & Guar. Co. v. United States,* 230 Ct.Cl. 355, 676 F.2d 622, 630 (Ct.Cl. 1982); *see also R.R. Donnelley,* 40 Fed.Cl. at 284.

statutes or regulations." *Southfork Sys., Inc. v. United States,* 141 F.3d 1124, 1132 (Fed.Cir. 1998) (citing *Keco Indus., Inc. v. United States,* 203 Ct.Cl. 566, 492 F.2d 1200, 1203–04 (1974) ("*Keco II*")). Under this test, a protester may establish that the Government's action is arbitrary and capricious without satisfying all of these elements. *See Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988);

*US Rentals,* 69 Comp. Gen. 395, 398, 90–1 C.P.D. ¶ 367 at 4 (1990) (citations omitted) (emphasis added); *see also Bonded Maintenance Co.,* 89–2 C.P.D. ¶ 51 at 2–3 (1989); *Tapex Am. Corp.,* 87–1 C.P.D. ¶ 63 at 3 (1987).

The GAO's analysis in these decisions recognizes the distinction between the discretion that a contracting officer possesses to cancel an invitation for bids ("IFB") prior to bid opening and the discretion that she possesses after bid opening. FAR 14.209(a) permits an agency to cancel an IFB prior to bid opening without a compelling reason; it simply requires that the agency determine that cancellation is "clearly in the public interest." 48 C.F.R. § 14.209(a). In contrast, FAR 14.404–1 requires in addition that the agency has a compelling reason for cancellation. Cancellation thus is disfavored after bid opening and is generally "inappropriate when other bidders would not be prejudiced by an award under an ostensibly deficient solicitation ... and when such an award would serve the actual needs of the government." *Canadian Commercial Corp.,* 94–1 C.P.D. ¶ 202 at 4 (1994); *see also Dyneteria, Inc.,* 84–1 C.P.D. ¶ 10 at 4 (1983); *Twehous Excavating Co.,* 83–1 C.P.D. ¶ 42 at 4 (1983). The contracting officer's generally broad discretion to cancel a solicitation is thus substantially narrowed after bid opening to prevent harm to the integrity of the bidding system.

Moreover, under the third *Keco* factor, this limited discretion necessitates that the plaintiff's burden of proof with respect to the issue of cancellation is lower than would apply if the procurement had been conducted by negotiation rather than sealed bidding,[21] or if the government had canceled the solicitation prior to bid opening. *See Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 65, 617 F.2d 590, 597 (1980) ("In formally advertised bidding the pertinent statutes and regulations are far more strict about the conduct of the procurement than in a negotiated one, consequently in negotiated procurement the contracting officer is entrusted with a relatively high degree of discretion."); *R.R. Donnelley & Sons, Co. v. United States,* 38 Fed. Cl. 518, 522–23 (1997); *126 Northpoint Plaza Ltd. Partnership v. United States,* 34 Fed.Cl. 105, 107 (1995).[22]

The contracting officer provided only one justification for cancellation of the solicitation: to restore integrity to the bidding system. The contracting officer's letter to plaintiff, date August 17, 1998, explained:

In its decision of July 1, 1998, the General Accounting Office (GAO) implicitly found the agency's practice of placing the bid box in the reception area and allowing bidders to date stamp their own bids undermined the integrity of the bid system. If the system lacks integrity then the entire system is tainted by that lack of integrity. In

---

**21.** Prior to October 10, 1997, the FAR permitted an agency to cancel negotiated procurements after the receipt of proposals if such action were "clearly in the public interest," which is the same standard that applies to cancellation of IFBs prior to bid opening. 48 C.F.R. § 15.608(b)(4) (1996). The GAO held that "as a general rule, in a negotiated procurement the contracting agency need only demonstrate a reasonable basis to cancel a solicitation after receipt of proposals, as opposed to the 'cogent and compelling' reason required to cancel an IFB where sealed bids have been opened." *CFM Equip. Co.,* 93–1 C.P.D. ¶ 280 at 4 (1993).

Effective October 10, 1997, the "clearly in the public interest" requirement was removed; the FAR now authorizes cancellation whenever "in the judgment of the contracting officer" the alternative of amending the solicitation is "so substantial as to exceed what prospective offerors reasonably could have anticipated." 48 C.F.R. § 15.206(e) (1997).

**22.** An earlier decision of this court held that both FAR 14.209(a) and 14.404–1 "give contracting officials a great deal of discretion to cancel solicitations either before or after bids are opened." *Aviation Enters., Inc. v. United States,* 8 Cl.Ct. 1, 19 (1985). The court disagrees with that analysis. It also notes that *Aviation Enterprises* involved a negotiated procurement, not a sealed bidding, as is the case here, and thus neither FAR provision governed that procurement.

Other decisions of the court have held that a contracting officer has extremely broad discretion to cancel an IFB after bid opening. *See Caddell Constr. Co. v. United States,* 7 Cl.Ct. 236, 241 (1985); *Contract Custom Drapery Serv. v. United States,* 6 Cl.Ct. 811, 818 (1984). Both cases, however, relied upon *American General Leasing, Inc. v. United States,* 218 Ct.Cl. 367, 587 F.2d 54 (1978), a Federal Circuit decision that involved a negotiated procurement. Those cases are therefore distinguishable from this case.

the Contracting Officer's view there is then only one appropriate remedy, resolicitation.

Resolicitation gives all bidders an opportunity to compete on an equal basis. Returning control of the bid box to the Government restores integrity to the bidding system. A full and fair remedy in this case demands that both be done.

Contracting officer's letter of Aug. 17, 1998, at 1. The contracting officer thus interpreted the GAO's opinion in *Pacific Tank* as an implicit condemnation of the Navy's procedure for time/date stamping bids. Although the court cannot be sure where the contracting officer identified this implicit finding, the court concludes that the following language from the GAO's decision provides the strongest support:

FAR § 14.304–1(c) clearly contemplates that the time/date stamp be securely under the control of the agency. Here, the record reflects that the stamp was not secure, so that bidders could themselves operate the stamp and then place a stamped bid in the bid box. Thus, the stamp placed on Cal Marine's bid envelope on January 14 does not establish that the bid was received prior to bid opening.

*Pacific Tank*, 98–2 C.P.D. ¶ 2 at 4.

The contracting officer's justification for canceling and resoliciting the procurement fails to state a compelling reason for such drastic action for a number of reasons. First, assuming that the GAO's analysis was correct, the most it suggests is that plaintiff's bid was late. Difficulties in resolving the timeliness of one bid, in other words, do not call into question the entire solicitation. Here, the only aspect of the procurement that was under question (prior to the agency's decision to cancel) was its decision determining the timeliness of California Marine's bid. Neither plaintiff nor defendant-intervenor challenged the integrity of the procurement process. It is important in this respect to recognize that the GAO implicitly *upheld* the integrity of the procurement process by concluding that the procurement should pro-

ceed and recommending award of the contract to Pacific Tank.

■ Moreover, there is no evidence that the integrity of the bidding system was breached in this case. The Navy has presented no factual findings to support its conclusion. Furthermore, the agency points to no provision of the FAR that was violated in this procurement, nor can it. Neither the FAR nor procurement statutes require agencies to utilize "secure" time/date stamp devices, though such a procedure may be the prudent course. *See Santa Cruz Constr., Inc.,* 87–2 C.P.D. ¶ 7 at 3 (1987). In fact, the only harm that can result from the lack of "secure" time/date stamp device is that a bidder in a similar position to the plaintiff here may not be able to prove that its bid was timely. But that "harm," if and when it occurs, does not taint the entire procurement process. *See Pershield, Inc.,* 73 Comp. Gen. 244, 246, 94–2 C.P.D. ¶ 46 at 4 (1994) ("We fail to see how the competitive system would be compromised by acceptance of a bid which was present at bid opening, but mistakenly overlooked."); *All–States,* 85–1 C.P.D. ¶ 174 at 4 (stating that "because the protester surrendered control of his bid upon depositing it into the locked [bid] box, there is no issue of compromising the integrity of the procurement system"), *aff'd on reconsideration sub nom. R.J. Lanthier Co.—Request for Reconsideration,* 89–2 C.P.D. ¶ 292 (1989). Absent a compromise to the competitive bidding process, the agency lacks a compelling reason for cancellation. *Cf. Northern Va. Van Co. v. United States,* 3 Cl.Ct. 237, 241 (1983).

There is no question that the bids opened at the bid opening, including that of Pacific Tank, were timely submitted in this solicitation. Therefore, as the defendant-intervenor correctly argues, even if the lack of a "secure" time/date stamp device ultimately deprives a bidder such as California Marine of consideration of its bid, that occurrence does not impact the timeliness of the other bids.[23] Under the FAR and procurement statutes, the Navy must make award to the bidder that submitted the lowest responsive bid.

---

23. For this reason, the Government's reliance upon *Northern Va. Van Co. v. United States,* 3 Cl.Ct. 237 (1983) is misplaced: there is no "compromise of the competitive process" in this case if the Navy awards the contract to a bid that was submitted prior to bid opening. *Id.* at 241.

See 41 U.S.C. § 253b(c) (1994); 48 C.F.R. §§ 14.301(a), 14.408–1(a). At least five bids are indisputably responsive. The Navy's decision to cancel the solicitation and not award the contract to the lowest responsive bidder therefore lacks the required compelling reason.

In short, if California Marine's bid was untimely, it should not be considered. If it were timely, it should be considered. But in neither circumstance should the solicitation be canceled to preserve the integrity of the procurement process. Rather, the integrity of the procurement process is best preserved by awarding a contract for this solicitation. The mere fact that, in the abstract, there may have been a better way to obtain evidence of bid submission dates is irrelevant if this particular solicitation is unaffected.

In addition, to the extent that the contracting officer relied on the GAO's July 1, 1998 opinion, the contracting officer's decision does not present a compelling reason for cancellation if the GAO decision was itself irrational. *See Honeywell,* 870 F.2d at 647. The GAO decision applied FAR 14.304–1, the late bid rule, to determine whether plaintiff's bid was timely. As the court will discuss further below, the late bid rule provides an exception to the general rule that only responsive bids may be considered for award; it only has utility once an agency has determined that a bid is late. Consequently, GAO erred as a matter of law by applying the late bid rule to determine whether California Marine's bid was late.

Even assuming that the late bid rule applies to this present dispute, the GAO failed to properly apply the late bid rule, as interpreted by prior GAO decisions, and failed to give due consideration to recent amendments to that rule which broaden the range of evidence that may be considered in applying that rule. The court finds that the GAO misinterpreted the rule to require exclusion of evidence of a time/date stamp if the device were not "securely under the control of the agency." The GAO failed to cite any authority for its conclusion,[24] and the court finds none either in the text of the FAR or prior GAO decisions.[25] The court can only presume that the GAO interpreted the language "maintained by the agency" to govern the clause "the time/date stamp of such installation," and further require that the word "maintained" is modified implicitly by the word "securely." The language of FAR 14.304–1(c) can be more straightforwardly interpreted as requiring only that the agency maintain the time/date stamp device within the agency installation. This interpretation of the sentence merely precludes the acceptance of time/date stamps not administered by the official device maintained by the agency, thus ensuring that all bids are time/date stamped using the same, official device.

Furthermore, again assuming arguendo that the late bid rule applies here, the GAO erred by failing to consider all relevant evidence in the administrative record to determine the timeliness of plaintiff's bid. The

---

**24.** Moreover, the court notes that a review of prior GAO decisions reveals that other Navy facilities allowed bidders to time/date stamp their own bids. *See, e.g., J.C. Kimberly, Inc.,* 94–1 C.P.D. ¶ 79 at 2 n. 1 (1994); *Amfel Constr., Inc.,* 68 Comp. Gen. 440, 440, 89–1 C.P.D. ¶ 477 at 1. Even though timeliness of bids was the central issue in each case, the GAO did not raise any concerns with the use of an "unsecure" time/date stamp device.

In addition, numerous GAO decisions reveal that agencies routinely allow bidders to deposit hand-carried bids in bid boxes without requiring any time/date stamp. *See, e.g., Wand Elec., Inc.,* 93–1 C.P.D. ¶ 59 at 2 (1993); *Santa Cruz Constr., Inc.,* 87–2 C.P.D. ¶ 7 at 3 (1987); *All–States R.R. Contracting, Inc.,* 85–1 C.P.D. ¶ 174 at 1, *aff'd on reconsideration,* 85–1 C.P.D. ¶ 314 (1985). This practice obviously creates greater potential for bid timeliness disputes than if a time/date stamp

is utilized, yet the GAO has expressed no concern with this practice nor suggested that such practice violates the integrity of the bidding system. In fact, in *Santa Cruz,* the protester challenged the adequacy of NASA's bid receipt procedures on this basis. The GAO responded that "procurement regulations regarding locked bid boxes do not require documenting the receipt of [hand-carried] bids." *Santa Cruz,* 87–2 C.P.D. ¶ 7 at 3.

**25.** The Government has not cited any authority in any of its briefs to support its argument that the time/date stamp on a bid cannot be given credence because an agency permitted bidders to stamp their own bids. When asked at oral argument, Government counsel stated that she could not identify any GAO decisions that have found such agency procedures to be deficient.

March 1997 amendment to the late bid rule explicitly incorporated the evidence standard developed by the GAO in its caselaw. *See infra.* That standard permits consideration of "all relevant evidence in the record," including statements of protester's personnel. *See, e.g., IPS Group,* 89–2 C.P.D. ¶ 327 at 2 (1989); *International Steel Erectors,* 89–1 C.P.D. ¶ 146 at 3 (1989). For all of these stated reasons, the GAO's finding that there was no proof that California Marine's bid was timely was based on erroneous interpretations of the FAR and GAO precedent, and was thus irrational. To the extent that the Navy relied on that decision, therefore, the agency decision did not state a compelling reason for canceling the solicitation.

▮ Finally, the Navy's cancellation decision cannot be justified as an effort to avoid litigation in this court. In its final brief submitted to this court, the Government argues that "the Navy's action was based in large part upon plaintiff having filed a complaint in this Court." Def.'s Br. of Oct. 14, 1998 at 5 n. 4. This justification fails to present a compelling reason for cancellation for two reasons. First, the agency's cancellation decision must be supported by evidence in the administrative record at the time of decision, not based upon *post hoc* rationalization. *See Burlington Truck Lines v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). Second, the rationale stated by the Government, which presumably is based upon a desire to avoid protracted litigation of the dispute or to appease the plaintiff, simply cannot be considered "compelling." *See Northern Va. Van Co. v. United States,* 3 Cl.Ct. 237, 242 (1983).

The Navy could have avoided protracted litigation by deciding, subsequent to the July 1, 1998 GAO decision, either to stick to its earlier determination that California Marine's bid was timely, or to follow the GAO's decision holding California Marine's bid to be untimely and award the contract to Pacific Tank. Failure to make a decision is not one of the listed criteria in FAR 14.404–1(c).

There being no rational basis for canceling the solicitation, the agency is thus presented with at least five indisputably timely bids, including Pacific Tank's. The agency had also previously determined that California Marine's bid was timely. However, because the timeliness *vel non* of California Marine's bid was properly raised in the complaint at the time it was filed; because the GAO decision relied on in part by the Navy found insufficient evidence of the timeliness of California Marine's bid; and because a protester must have standing, the court is compelled to address the issue of timeliness.[26]

## II. Timeliness of California Marine's Bid

▮ Before addressing the merits of the timeliness of plaintiff's bid, this court must first discuss in some detail the issue of timeliness of bids in general, and the late bid rule in particular, because GAO's misapplication of that rule in its July 1, 1998 decision lies at the heart of the present dispute. Generally, only bids that are timely received by the procuring agency may be considered for award. *See* 48 C.F.R. §§ 14.301(a), 14.302(a); *Ed Kocharian & Co.,* 96–1 C.P.D. ¶ 170 at 2 (1996). To be considered timely, a bid must be delivered to the place specified in an IFB[27] on or before the time and date

26. The Federal Circuit and its predecessor, the Court of Claims, have repeatedly emphasized that a violation of a procurement statute or regulation, without more, is not sufficient to find an agency decision to be arbitrary and capricious; a plaintiff must show that is was prejudiced by the violation. *See, e.g., Southfork Sys.,* 141 F.3d at 1134 (citing *Keco II,* 492 F.2d at 1204); *Data General Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996). Furthermore, "to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract." *Data General,* 78 F.3d at 1562. Here,

California Marine could only be considered for award if its bid was responsive, which includes the requirement that its bid was timely. *See* 48 C.F.R. §§ 14.301(a), 14.302(a). Therefore, to establish a "reasonable likelihood" that it would have been awarded the contract but for the agency's erroneous decision to cancel the solicitation, plaintiff must meet its burden of proving that its bid was timely.

27. An IFB must specify a mailing address for the submission of bids, *see* 48 C.F.R. § 14.201–2(a)(2)(ii); it may also, as in the present case, specify an address for the delivery of hand-car-

specified in the IFB. *See* 48 C.F.R. §§ 14.301(a), 14.302(a): *Carothers Constr. Inc. v. United States*, 18 Cl.Ct. 745, 750 (1989). The FAR does not explicitly provide what evidence an agency should consider to determine whether a bid is timely. The GAO, which hears dozens of bid-protests challenging the timeliness of bids selected for award each year, has repeatedly held, however, that "all relevant evidence in the record" may be considered to resolve the issue of timeliness of hand-carried bids. *See, e.g., J.C. Kimberly Co.*, 94–1 C.P.D. ¶ 79 at 3 (1994); *Wand Elec.*, 93–1 C.P.D. ¶ 59 at 3.[28] This standard includes consideration of statements by a protester's employees. *See, e.g., Boulder Constr., Inc.*, 93–1 C.P.D. ¶ 122 at 3 (1993); *IPS Group*, 89–2 C.P.D. ¶ 327 at 2; *International Steel*, 89–1 C.P.D. ¶ 146 at 3; *Santa Cruz*, 87–2 C.P.D. ¶ 7 at 2.[29] The protester bears the burden of proving by a preponderance of the evidence that its bid was timely submitted. *See, e.g., IPS Group*. 89–2 C.P.D. ¶ 327 at 2; *Santa Cruz*, 87–2 C.P.D. ¶ 7 at 2.

 The FAR provides that a bid is late, i.e. untimely, if it is "received in the office designated in the invitation for bids after the exact time set for opening." *Id.* § 14.304–1. Whether a bid is timely or late is thus determined by when it is *received at the designated office*, not when it is discovered by the agency, or when it is opened by agency personnel. *See Leland & Melvin Hopp, Partners*, 84–1 C.P.D. ¶ 204 at 2–3 (1984); *Building Maintenance Corp.*, 79–2 C.P.D. ¶ 374 at 2 (1979). A timely bid does not become late simply because the government overlooks the bid in a bid box; rather, if the bid is timely delivered to the place specified in the IFB for the receipt of bids, the bid is timely and must be considered for award, even if the bid is not discovered and opened until after the scheduled bid opening. *See, e.g., Wand Elec.*, 93–1 C.P.D. ¶ 59; *All–States*, 85–1 C.P.D. ¶ 174; *Robert McMullan & Son, Inc.*, B–197613, *available in* 1980 WL 16588 (Comp.Gen. May 19, 1980). This distinction becomes significant in the present case, where the plaintiff claims that its bid was deposited in the bid box prior to bid opening, but the agency did not discover and open the bid until six days after bid opening.

 Even if a bid is determined by an agency to be late, however, the agency may still be able to consider the late bid under the late bid rule, which provides a number of exceptions to the general rule that only bids that are timely received by the procuring agency may be considered for award. *See* 48 C.F.R. § 14.304–1; *see also Ed Kocharian & Co.*, 96–1 C.P.D. ¶ 170 (1996) (approving an agency's consideration of a late hand-carried bid); *Data General Corp.*, 93–1 C.P.D. ¶ 457 (1993) (approving the Army's consideration of a late mailed bid).[30] Under this rule, mailed or hand-carried bids, even though determined by an agency to be late, may be considered for award if: (1) received prior to award, *see* 48 C.F.R. § 14.304–1(a): (2) "late receipt was due primarily to government mishandling after receipt at the government installation," *id.* § 14.304–1(a)(2); and (3) "consideration of the bid would not compromise the integrity of the procurement process because the bid was in the sole custody

---

ried bids, i.e. bids delivered by contractor employees or some agent of the contractor, such as an overnight courier.

sions Ltd., 83–1 C.P.D. ¶ 525 at 3 (1983) (relying solely on the statement of the protester's president).

**28.** Although at one point in time the GAO stated that evidence furnished by the protester—for example, statements or affidavits of the protester's employees—may not be considered, *see, e.g., Bill Bouska Constr., Inc.*, 80–2 C.P.D. ¶ 411 at 2 (1980); *Lockley Mfg. Co.*, 59 Comp. Gen. 189, 190, 80–1 C.P.D. ¶ 15 at 2–3 (1980), it subsequently relaxed that rule to permit "all relevant evidence in the record" to be considered, see accompanying text, though statements by a protester's employees must be supported by some independent evidence. *See Boniface Tool & Die, Inc.*, 87–2 C.P.D. ¶ 47 at 2 (1987). *But see Vi-*

**29.** In addition to these cases, numerous GAO decisions have relied at least in part on statements or affidavits of protesters' employees. *See, e.g., Visions Ltd.*, 83–1 C.P.D. ¶ 525 at 3; *Carothers Constr., Inc.*, 89–2 C.P.D. ¶ 338 at 2 n. 2 (1989); *Arnold Rooter, Inc.*, 65 Comp. Gen. 71, 71, 85–2 C.P.D. ¶ 574 at 2 (1985).

**30.** The late bid rule also permits consideration of late bids if sent by registered, certified, or regular mail, Express Mail, or by telegram, facsimile, or an "electronic commerce method" if authorized by the solicitation. *See* 48 C.F.R. § 14.304–1(a).

of the government, and therefore unalterable by the bidder, from its receipt at the installation until its actual opening." *Data General,* 93–1 C.P.D. ¶ 457 at 3.[31]

By necessity, this second element requires that a protester show that its bid was received at the government installation prior to bid opening. *See Kelton Contracting, Inc.,* 95–2 C.P.D. ¶ 254 at 3 (1995); *H.V. Allen Co.,* 84–2 C.P.D. ¶ 605 at 2 (1984). FAR 14.304–1(c), as amended in March 1997, provides that: "Acceptable evidence to establish the time of receipt at the Government installation *includes* the time/date stamp of such installation on the bid wrapper, other documentary evidence of receipt maintained by the installation, or oral testimony or statements of Government personnel." 48 C.F.R. § 14.304–1(c) (emphasis added).[32] The preamble to the final rule adopting this evidentiary standard makes clear, however, that the provision provides agencies with "flexibility" in the evidence they can consider "by applying standards used by the General Accounting Office." 61 Fed.Reg. 69,292, 69,292 (1996). Since March 1997, therefore, FAR 14.304–1(c) permits agencies to consider "all relevant evidence in the record"—the evidentiary standard developed by the GAO through its decisions prior to March 1997, *see*

supra note 31—when determining whether a late bid may be considered.

The GAO has often noted the distinction between the issue of whether a bid is timely, and whether, if a bid is not timely (and is thus late), it may be considered by the agency under the late bid rule. The second question only arises if the answer to the first question is resolved in the negative. *See, e.g., Larry Carlson & Assocs., Inc.,* 83–2 C.P.D. ¶ 599 at 4 (1983); *Bill Bouska Constr., Inc.,* 80–2 C.P.D. ¶ 411 at 3–4 (1980); *Lockley Mfg. Co.,* 59 Comp. Gen. 189, 190, 80–1 C.P.D. ¶ 15 at 2–3 (1980). Furthermore, although at first glance the first question appears to be replicated in the second element of the late bid rule, which requires a determination whether the late bid was received at the government installation prior to bid opening, the two tests are distinct. The former looks to whether a bid was received at the *designated office* prior to bid opening; the latter test is applied to determine whether a late bid (which by definition, was not received at the designated office prior to bid opening) was received at the *government installation* prior to bid opening, i.e. anywhere on the government installation other than the designated office.[33]

31. Prior to March 3, 1997, the late bid rule did not permit consideration of hand-carried late bids. *See* 48 C.F.R. § 14.304–1(a) (1996). In fact, the predecessor to the FAR, the Federal Procurement Regulations ("FPR"), explicitly precluded consideration of late hand-carried bids. *See* 41 C.F.R. § 1–2.303–5 (1984). The first edition of the FAR, which was promulgated later in 1984, did not include this provision. *See* 48 C.F.R. § 14.304–1 (1984).

Nevertheless, GAO, through a series of protest decisions, created a "common law" late bid rule for hand-carried late bids. Under this common law exception, GAO permitted agencies to consider hand-carried late bids if (1) the bid was timely received at the agency; (2) mishandling by the government was the paramount cause of late receipt at the designated office; and (3) consideration of the bid would not compromise the integrity of the procurement process. *See Kelton Contracting, Inc.,* 95–2 C.P.D. ¶ 254 at 3 (1995). The GAO permitted agencies to consider "all relevant evidence in the record" to determine whether a bid was timely received at the agency. *See id.* This GAO—crafted exception thus adopted the same evidentiary standard that has always applied to determinations of the timeliness of bids. *See* text *supra.*

In December 1996, the rule was amended to include a provision allowing the consideration of late hand-carried bids; the effective date of the amendment was March 3, 1997. *See* 61 Fed. Reg. 69,292, 69,293 (1996) (codified at 48 C.F.R. § 14.304–1(a)(2), (c)).

32. Prior to March 1997, this provision was less expansive: "The *only* acceptable evidence to establish the time of receipt at the Government installation is the time/date stamp of such installation on the bid wrapper or other documentary evidence of receipt maintained by the installation." 48 C.F.R. § 14.304–1(c) (1996) (emphasis added).

33. The distinction between "designated office" and "government installation" is thus critical, though regrettably the terms are not defined in the FAR. A careful review of past GAO decisions and the Federal Register preamble to the March 1997 amendment to the late bid rule reveals the following distinction: "designated office" refers to the particular location designated for the receipt of bids in the IFB; "government installation" refers to the entire government facility in which the "designated office" is located. Thus, in the present case, Building 291 was the desig-

The flaws in GAO's analysis in its July 1, 1998 decision are thus apparent and material to its determination that California Marine's bid was untimely. First, GAO started its analysis by applying the late bid rule to determine whether California Marine's bid was timely, thereby assuming the conclusion that it was trying to reach. The GAO should have addressed the timeliness of plaintiff's bid first, and then applied the late bid rule only if it first determined that California Marine's bid was late. Second, although GAO correctly cited the amended text of the late bid rule, it proceeded to misinterpret the language of the rule by (1) requiring that the time/date stamp device be securely under the control of the agency; and (2) failing to consider all relevant evidence in the record. Notably, GAO failed to recognize that this was the appropriate evidentiary standard; more importantly, as a result, it failed to consider probative evidence. For example, GAO did not consider evidence of Ms. Holloway's admission that she had overlooked several bids in the past, or that Ms. Nixon recalled seeing California Marine's bid in the bid box before Mr. Carr and Mr. Jacobs visited the Naval Station on January 14, 1998. Third, GAO cited precedent that interpreted the pre–1997 version of the late bid rule.[34] In light of these errors, this court holds that GAO's decision was irrational.

nated office for delivery of hand-carried bids, whereas the "government installation" was the San Diego Naval Station.

GAO decisions, in general, have recognized this distinction. *See, e.g., Larry Carlson,* 83–2 C.P.D. ¶ 599 at 2; *Lockley Mfg.,* 59 Comp. Gen. at 190. On numerous occasions, however, the GAO has failed to recognize this distinction, thus creating a confusing body of case law. *See, e.g., J.C.N. Constr. Co.,* 96–1 C.P.D. ¶ 42 (1996) (misapplying the late bid rule to determine whether a bid was timely); *T & A Painting, Inc.,* 89–1 C.P.D. ¶ 369 at 2 (1989) (transposing the term "installation" for the term "office" when citing the test for timeliness stated in *Leland & Melvin Hopp,* 84–1 C.P.D. ¶ 204).

Through a chain of cases, including *Pershield, Inc.,* 73 Comp. Gen. 244, 94–2 C.P.D. ¶ 46 (1994) and *Kuhnel Co.,* 70 Comp. Gen. 131, 90–2 C.P.D. ¶ 455 (1990), the GAO has continued to apply the erroneous test created in *T & A Painting,* which is now cited by the GAO as a formulation of the late bid rule. In *Pacific Tank,* GAO relied on both *Pershield* and *Kuhnel. See Pacific Tank,* 98–2 C.P.D. ¶ 2 at 3,5.

In the present case, the relevant issue is whether California Marine's bid was timely deposited in the bid box in the reception area in Building 291, not whether its bid should be accepted under the late bid rule. Plaintiff alleges that its bid was deposited in the bid box at approximately 8:30 a.m. on January 8, 1998, prior to bid opening. If true, its bid was clearly timely and must be considered by the Navy for award.

As stated earlier, GAO precedent state that this issue must be resolved by the agency after reviewing "all relevant evidence in the record," including statements of plaintiff's employees. *See, e.g., Boulder Constr., Inc.,* 93–1 C.P.D. ¶ 122 at 3; *IPS Group,* 89–2 C.P.D. ¶ 327 at 2. The evidence gathered by the agency in the administrative record is considerable: the time/date stamp on California Marine's bid; the affidavit of Mr. Jacobs stating that he deposited the bid shortly after 8:30 a.m.; the visitor log entry corresponding to Mr. Jacobs visit; Ms. Holloway's affidavit recounting her hasty review of the bids, acknowledging that she may have overlooked a bid, and admitting that she has accidentally overlooked bids several times in the past; Ms. Nixon's affidavit stating her recollection that California Marine's bid was in the bid box on the morning of January 14;[35] Mr. Carr's affidavit relating his unre-

**34.** See *supra* note 33, which discusses errors in *J.C.N. Construction, Pershield,* and *Kuhnel,* three cases relied upon by the GAO in its decision, and *supra* note 32 and accompanying text, which discusses the broadened scope of evidence that must be considered under the amended late bid rule.

**35.** The evidence concerning the location of California Marine's bid in the bid box is inconclusive. Ms. Nixon initially stated that she saw California Marine's bid on top of the other bids in the bid box on the morning of January 14. This statement would not support California Marine's position, because at least one bid was deposited in the bid box after January 8 and should have been on top of the stack if California Marine's bid was deposited on January 8. On reflection, however, Ms. Nixon retracted her statement.

The second piece of placement evidence was provided by Ms. McCanna, who stated that California Marine's bid was found on the bottom of the stack of loose bids on the afternoon of January 8. At first sight, this evidence would appear to contradict plaintiff's theory, because two bids

turned telephone calls to David Welch on January 8 and 14, and his visit to the Naval Station with Mr. Jacobs on the afternoon of January 14; the record of voice mail messages left for Mr. Welch; the absence of any record in the visitor log of visits to Building 291 between January 8 and January 14, and a record confirming that Mr. Carr and Mr. Jacobs visited the building for only five minutes on the afternoon of January 14; and the photocopy of California Marine's bid envelope, which reveals that the last four digits of the solicitation number, which are the only numbers that distinguish the various solicitations awarded by the San Diego Naval Station, are difficult to read even after careful viewing.

In addition, it must be noted that California Marine's bid was over $300,000 lower than Pacific Tank's bid; as the agency pointed out, there would be no reason for a bidder attempting to carry out this alleged scheme to underbid Pacific Tank's bid by such a large amount. Moreover, the time lapse between Mr. Carr's two calls to Mr. Welch supports plaintiff's assertions. It simply is not credible that a bidder wishing to commit the fraud indirectly alleged by Pacific Tank would have waited six days to drop the bid in the bid box and stage a telephone inquiry to the Navy—the chance that one of the contracting staff may have opened the bid box in the intervening period and later recalled the absence of California Marine's bid was not negligible.[36]

On the other hand, there is scant evidence to support Pacific Tank's implicit assertions of fraud. First, there are Ms. Holloway's statements that she does not recall seeing California Marine's bid in the bid box on January 8, and that she cannot see how she could have overlooked the bid if it were there. Her statement must be discounted, however, by her admission of prior mistakes; her statement that she reviewed all of the bids in approximately thirty seconds; and

the fact that the solicitation number on California Marine's bid is difficult to read.

The only other evidence supporting Pacific Tank's assertions are the facts that the time/date stamp device was open to public access and that visitors to Building 291 could enter the building without signing the visitor log. This evidence merely supports the possibility that Pacific Tank could be correct. Fraud is a serious allegation, moreover, and should not be presumed merely because it is possible. *See Loesch v. United States.* 227 Ct.Cl. 34, 645 F.2d 905, 921 (Ct.Cl.) (stating that "fraud will not be presumed, and it must rest on something more substantial than suspicion, speculation, or a hint of fraud"), *cert. denied,* 454 U.S. 1099, 102 S.Ct. 672, 70 L.Ed.2d 640 (1981); *Hageny v. United States,* 215 Ct.Cl. 412, 570 F.2d 924, 933 (Ct.Cl.1978) ("Defendant's burden is such that the evidence of record must be so clear and convincing that the mind can rest with safety upon a finding that fraud has been established."); *Kamen Soap Prods. Co. v. United States,* 129 Ct.Cl. 619, 124 F.Supp. 608, 620 (Ct.Cl.1954) (requiring clear and convincing evidence of fraud by a contractor). The evidence cited by Pacific Tank does not provide significant support for its assertions.

The GAO has itself taken the same dim view of the likelihood of alleged fraudulent action in similar circumstances. In *Wand Electric,* 93–1 C.P.D. ¶ 59, the protester's president, who was present when bids were opened, objected that its bid had not been read at the bid opening. The protester claimed that it had deposited its bid in the bid box prior to bid opening. An investigation revealed that the agency personnel had collected bids from the bid box fifteen to twenty minutes prior to bid opening, and the bid box had not been checked thereafter. Although the protester's bid did not bear any time/date stamp, the GAO concluded that the

in the bid box were submitted in 1997 and should perhaps have been at the bottom of the stack. However, there were at least two occasions on which the bids could have been mixed up: on January 8, when Ms. Holloway sorted through all of the bids before returning some of them to the bid box, and then again on the morning of January 14, when Ms. Nixon sorted

through the bids looking for a bid submitted the previous day.

**36.** In fact, the bid box *was* opened in the intervening period and Ms. Nixon's recollection that she saw California Marine's bid on that occasion supports plaintiff's claims.

bid had been timely submitted. Regarding the possibility of fraud, the GAO stated:

> While an employee of [the protester] might have been listening outside the bid opening room so as to submit a low (and late) bid, we believe that under the circumstances, it is illogical to hypothesize such abuse, dependent as it is on the unforeseeable failure of agency personnel to check the bid box just prior to bid opening.

*Id.* at 3; *accord T & A Painting,* 89–1 C.P.D. ¶ 369 at 2–3; *All–States,* 85–1 C.P.D. ¶ 174 at 3.

In conclusion, a review of all relevant evidence in the record reveals that a clear preponderance of the evidence supports plaintiff's assertion that its bid was timely submitted on January 8, 1998.[37] The court concludes, therefore, that California Marine's bid was timely and that the GAO erred in finding to the contrary. This conclusion is in accord with the Navy's thorough analysis of all available evidence during the agency-level protest, in which it determined that California Marine's bid was timely.

## CONCLUSION

For the reasons stated, the Navy's decision to cancel the solicitation was arbitrary and capricious and not in accordance with law. Its implementation is, therefore, enjoined. The agency is directed to consider the bid of California Marine as timely submitted. The Government's motion for judgment on the administrative record is denied, defendant-intervenor's cross-motion for summary judgment is denied insofar as it sought award of the contract to Pacific Tank, and plaintiff's cross-motion for summary judgment is granted. Costs to plaintiff.

**37.** Moreover, the court emphasizes that the evidence would support this conclusion even absent consideration of the affidavits of Mr. Carr and Mr. Jacobs, if the court were to apply the GAO's former evidentiary rule stated in *Lockley Manufacturing,* which excludes statements of protesters' employees. *See supra* note 28 and accompanying text.